# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| STEPHANIE J. MALONEY, EVERETTE D. MALONEY, and ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| vs | ) ) ) | FILE NO: _2:20-cv-00191-RWS |
| TALLULAH RIVER CO., INC. A/K/A TALLULAH RIVER COMPANY A/K/A TALLULAH RIVER RESORT; RANDOLPH JACKSON; PATRICIA JACKSON; RIVER FALLS AT THE GORGE, INC.; DANA PACCIOTTI; SHEA SMITH; ROBERT GAYLE; TORRI GAYLE; and WINDY SKY RENTALS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | | |

## COMPLAINT FOR FEDERAL RICO, STATE LAW CLAIMS FOR DAMAGES AND CLASS CERTIFICATION

### INTRODUCTION AND SUMMARY OF THE CASE

Thirty years ago, Defendants Randolph and Patricia Jackson discovered the perfect "cash cow" business through which they could generate, and then divert, funds to themselves and their family – a campground and recreational complex that they could sell membership shares in, while also providing (and charging for)

services to the general public. The Jacksons (and, to varying degrees, the other Defendants) have engaged in wrongdoing that ranges from the relatively simple to the outrageous in furtherance of their fraudulent scheme. Their acts of wrongdoing include, but are not limited to:

- Selling fractional interests in the property without recording, tracking, or properly accounting for such interests;

- Selling the campground and retaining a security interest in it, under sketchy terms designed to allow the Jacksons to foreclose on the property after reaping millions of dollars in note payments;

- Failing to accurately describe their security interest in the property or to account for the legitimate ownership interest held by individuals who had bought shares, thereby overstating the extent of the Jacksons' own interest;

- Participating with a new owner to implement a "dues-buyout" program to generate immediate cash to be paid over to the Jacksons through note payments, and thereby deprive the new owner of income necessary to properly runt the resort;

- After foreclosing on the property, excluding owners with valid membership interests from their use and enjoyment of the property;

-2-

- Claiming that they have complete and exclusive ownership while at the same time sending hundreds of owners with membership interests a letter fraudulently claiming thousands of dollars of overdue amounts and offering to relieve the owners of liability in exchange for a quit claim deed to their property interests;

- Claiming on tax returns for the businesses that moneys paid to their daughters were "commissions," even though neither daughter ever worked for or directed the activities of the business;

- Testifying, when later confronted with that contradiction, that those very same "commissions" were actually "loans," and that several years of their tax returns were entirely false; and,

- Using bank and wire transfers to divert funds generated through their fraudulent activities to their daughters' accounts.

By creating multiple entities through which to channel the funds generated by the membership interests and campground fees, and by involving their daughters and, eventually, Robert and Torri Gayle, the Jacksons have created a long-lasting, lucrative enterprise to their own wrongful enrichment and the detriment of the Maloneys and others similarly situated. While Plaintiffs only seek to recover for acts that fall within the relevant statute of limitations, Defendants' wrongdoing in

-3-

furtherance of their fraudulent enterprise spans three decades and has resulted in a windfall of millions of dollars to Defendants.

Accordingly, this is a class action lawsuit seeking to vindicate Plaintiffs' rights and valuable interest in a resort property in Rabun County, Georgia. Through fraud, schemes and artifice, Defendants have wrongfully taken such interests from them. Plaintiffs therefore seek class status to assert federal RICO claims, and state law claims for fraud, conspiracy, as well as breach of warranty deeded interests, co-tenancy rights, rights under real estate covenants, attorneys' fees, and punitive damages.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 based on the Federal RICO claims brought pursuant to 18 U.S.C. § 1961 *et seq*. The Court has supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367.

2.      Alternatively, this Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332(d)(2), as this case involves claims filed under the Class Action Fairness Act, in which at least one Plaintiff is diverse in citizenship from at least one Defendant and the amount in controversy exceeds $5,000,000.

3.     This Court has personal jurisdiction over the non-Georgia Defendants under O.C.G.A. § 9-10-91, because they have committed tortious acts or omissions and other wrongful conduct in Georgia, have caused tortious injuries in Georgia, and have sufficient minimum contacts with Georgia.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because at least one Defendant resides in this District. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because the property that is the subject of this action is located in this District and Division and a substantial part of the events that give rise to Plaintiffs' claims occurred in this District and Division.

## PARTIES

5.     Plaintiffs Dean and Stephanie Maloney, husband and wife (the "Maloneys"), are citizens of Georgia, as they are domiciled at 1510 Fox Hound Trace, Woodstock, GA 30188.

6.     Defendant Tallulah River Co., Inc. a/k/a Tallulah River Resort a/k/a Tallulah River Company ("TRC") is a Georgia corporation, with its principal office and Registered Agent located at 32 Resort Dr., Lakemont, Georgia 30552, where it may be served with a Summons and this Complaint.

7.     Defendant River Falls at the Gorge, Inc. ("River Falls") is a Georgia corporation, with its principal office and Registered Agent located at 32 Resort Dr., Lakemont, Georgia 30552, where it may be served with a Summons and this Complaint.

8.     Defendants Randolph and Patricia Jackson, husband and wife (the "Jacksons"), are presently citizens of Tennessee, as they are now domiciled at 1070 Lewisburg Pike, Franklin, Tennessee 37067, where they may be served with Summonses and this Complaint.

9.     The Jacksons purport to be the sole or primary businesspeople and shareholders of TRC. In fact, the Jacksons are *alter egos* of TRC because they:

    a.     Have consistently disregarded the separateness of TRC's corporate-entity status;

    b.     Have made TRC the mere instrumentality of and for the transaction of the Jacksons' own affairs and the affairs of the Jacksons' immediate family members;

    c.     Have such unity of interests and ownership that TRC and the Jacksons do not have separate personalities; and,

    d.     Have admitted in a related lawsuit, *Thomsen v. Tallulah River Company, et al*, Superior Court of Rabun County, Georgia, Civil Action

-6-

Number 2014CV0150 (the "Related Action"), that TRC and the Jacksons are in fact *alter egos* of one another.

10.     To adhere to the doctrine of a separate corporate entity in TRC would promote injustice and protect the Jacksons' fraud, which they have perpetrated on the Maloneys and others similarly situated, as further shown herein.

11.     In the Related Action, Mrs. Jackson testified under oath in a September 2016 deposition and in the August 2019 trial that the shares in River Falls were owned jointly by Mrs. Jackson, who had a 50% share interest in River Falls, with the remaining 50% share interest owned by the Jacksons' two daughters, who each had a 25% share interest in River Falls.

12.     In a February 2020 post-judgment deposition, Mrs. Jackson testified that all shares in River Falls are now owned exclusively by her two daughters.

13.     Defendant Dana Pacciotti is the Jacksons' elder daughter. She is a citizen of Georgia, as she is domiciled at 242 Lakewood Cove, Demorest, Georgia 30535, where she may be served with a Summons and this Complaint.

14.     Defendant Shea Smith is the Jacksons' younger daughter. She is a citizen of Tennessee, as she is domiciled at 3247 South Hall Road, Franklin, Tennessee 37064, where she may be served with a Summons and this Complaint.

15.     According to the prior testimony of Mrs. Jackson, Ms. Pacciotti and Ms. Smith (collectively, for brevity, the "Daughters") presently own 100% of the shares in River Falls, with each of the two Daughters owning 50% of the shares in River Falls.

16.     Despite the Daughters' share interests in River Falls, the Jacksons are the sole businesspeople who direct and take action for and on behalf of River Falls.

17.     River Falls has no legitimate business function and serves only to improperly divert money from the Resort, as defined herein, to the other Defendants to their own private accounts and for their own personal use.

18.     The Jacksons and the Daughters are *alter egos* of River Falls because they:

    a.     Have consistently disregarded the separateness of River Falls' corporate-entity status;

    b.     Have made River Falls a mere instrumentality of and for the transaction of their own affairs and for the wrongful gain of the Daughters and the Jacksons; and,

    c.     Have such unity of interests and ownership that the Jacksons and the Daughters do not have separate personalities from the corporate entity River Falls.

19.     To adhere to the doctrine of a separate corporate entity in River Falls would promote injustice and protect the fraud of the Jacksons and the wrongful and ill-gotten benefit of the Daughters, to the detriment of the Maloneys and others similarly situated, as shown herein.

20.     The Daughters have wrongfully received money and other benefits from the Jacksons, TRC, and River Falls, derived from the Jacksons' fraudulent wrongful conduct, perpetrated individually and by and through TRC and River Falls, as further set forth herein.

21.     The Jacksons, TRC, River Falls, and the Daughters have a unity of interests in perpetrating, aiding and abetting, concealing, and benefiting from the fraud and other misconduct set forth herein. They are therefore collectively referred to herein as the "Jackson Parties."

22.     Defendants Robert Gayle and Torri Gayle, husband and wife (the "Gayles"), are co-conspirators with the Jackson Parties, as described herein.

23.     The Gayles are both citizens of Georgia, as they are domiciled at 1 Holly Mountain Road, Lakemont, Georgia 30552, where they may be served with Summonses and this Complaint.

24.     Windy Sky Rentals, LLC ("Windy Sky") is a Georgia limited liability company with only two members: Robert and Torri Gayle.  As alleged above, both

Robert and Torri Gayle are citizens of Georgia. Windy Sky's principal office and its Registered Agent, Torri Gayle, are located at 32 Resort Drive, Lakemont, Georgia 30552, where it may be served with a Summons and this Complaint.

25.     The Gayles are *alter egos* of Windy Sky because they:

    a.    Have consistently disregarded the separateness of Windy Sky's corporate-entity status;

    b.    Have made Windy Sky a mere instrumentality of and for the transaction of the Gayles' own affairs; and,

    c.    Have such unity of interest and ownership that Windy Sky and the Gayles do not have separate personalities.

26.     To adhere to the doctrine of a separate corporate entity in Windy Sky would promote injustice and protect the Gayles' misconduct, which they have perpetrated on the Maloneys and others similarly situated, as further shown herein.

27.     The Gayles and Windy Sky have a unity of interest in perpetrating, aiding, abetting, and colluding with the Jackson Parties, and concealing and benefiting from their fraud and other misconduct set forth herein.  The Gayles and Windy Sky are therefore collectively referred to herein as the "Gayle Parties."

-10-

## STATEMENT OF FACTS

### A.    History of the Resort

28.    Tallulah River Resort (the "Resort") is a campground and recreational complex located approximately a mile from the Tallulah Gorge in Rabun County, Georgia. The real property consists of approximately 68 acres and is bounded on the North, South, and East by the Tallulah River.

29.    The Resort was initially developed by All American Resort at Tallulah Falls in 1984.

30.    The Jacksons formed TRC and purchased the Resort out of foreclosure for $375,000 in 1989.

31.    Together with the real property, the facilities in place at that time were approximately 100 RV campsites, a two-story clubhouse with an indoor swimming pool, a game room, a country store, a restaurant, and numerous other amenities.

32.    In addition, TRC purchased 4,873 out of 5,000 "Undivided Interests" or "UDIs," discussed below, as part of TRC's ownership interest in the Resort.

33.    By the time TRC purchased the Resort in 1989, 127 Undivided Interests (UDIs) had been sold by the Resort's previous owner to individual UDI purchasers.

34.    The interests conveyed in the Resort were known as "Undivided Interests" or "UDIs" under the terms of the "Declaration of Covenants, Conditions, and

Restrictions for the Resort (the "Declaration"). As defined in the Declaration, a UDI is a real property, undivided fractional interest in the property, with each owner having a tenant-in-common interest in the Resort property.

35.    The Resort's initial Public Offering Statement expressly provides that, "each owner of a UDI owns a 1/5,000 interest. As such, the conveyance of the interest in Tallulah River Resort involves real property ownership.

### B.    The Jacksons' Initial Involvement in the Resort

36.    From 1989 to 1999, the Jacksons and TRC ran the Resort and sold to individual purchasers numerous UDIs. The Jacksons themselves estimate that they sold between 1,000 and 1,300 UDIs during this 10-year period.

37.    On average, the Jacksons and TRC sold UDIs for $5,000 apiece during this time. This generated approximately $5,000,000 in revenue for the Jacksons and TRC.

38.    The Jacksons and TRC used a numbering system for UDIs sold by them, but it was not sequential. The Jacksons do not know how many UDIs they sold from 1989 to 1999. As UDIs were sold, resold, transferred, retired, and sometimes went unrecorded, it is difficult to know how many UDIs were sold.

**C.      The Maloneys' Representative Ownership Interest in the Resort**

39.     On or about October 7, 1989, the Maloneys entered a Purchase Contract with TRC in which the Maloneys agreed to pay $5,000 to TRC in exchange for a UDI. TRC sold and conveyed this real property to the Maloneys as tenant-in-common in the real property, together with the rights and obligations of owning a UDI as described in the Declaration and the Agreement for Co-Tenancy in the Resort.

40.     The Jacksons and TRC warranted that they would convey title to the property in fee simple by Warranty Deed to the Maloneys. By such Warranty Deed, the Maloneys' UDI was then and thereby owned by the Maloneys in fee simple and labelled as "Unit No. 1282," for identification purposes. Other UDI owners were similarly situated, as all other Warranty Deeds during this time were likewise warranted and identified with a UDI number in a similar manner.

41.     The Maloneys and all other warranty-deeded UDI holders were treated as "Members" and permitted to use and enjoy the Resort as expressly stated in the Declaration and Agreement of Co-Tenancy.

42.     The Maloneys' Warranty Deed, like the others, was expressly made subject to and dependent upon the Declaration and the Agreement of Co-Tenancy.

43.    A true and correct copy of the Maloneys' Purchase Contract, Warranty Deed, and all related documentation received by the Maloneys from the Jacksons and TRC upon their purchase are attached collectively hereto as **Exhibit A**.

44.    The Maloneys' interests in the Resort are similarly situated to all other Members and holders of UDI and Warranty Deed interests in the Resort, including all rights contained in the Declaration and Agreement for Co-Tenancy (collectively, their "Resort Ownership Interests").

### D.    The Jacksons Sell the Resort in 1999

45.    In April of 1999, TRC and the Jacksons purported to sell the Resort to Tallulah River Mountain Resort, Inc. ("TRMR") for $3,000,000.

46.    After the sale, the Jacksons held a security deed in the Resort and received payments from TRMR pursuant to a promissory note in the initial amount of $2,700,000.

47.    With the Jacksons' assistance, TRMR initially funded the note payments by offering the Resort's UDI owners a "dues-buyout" option, whereby the owners would be relieved of any future obligation to pay dues if they paid dues of several thousands of dollars in a lump sum at that time.

48.    On information and belief, this dues-buyout or "dues for life" program generated approximately $500,000 in immediately available cash to TRMR, which

TRMR then paid over to the Jacksons in promissory note payments of greater than $28,000 per month. It also sabotaged the Resort's cash flow thereafter.

49.    The Jacksons and TRMR reached an agreement on the percentages of cash collected under the dues-buyout program in the Purchase and Sale Agreement of April 4, 1999 when TRC purported to sell the Resort to TRMR. A true and correct copy of the Purchase and Sale Agreement is attached hereto as **Exhibit B**.

50.    The Jacksons and TRC held a security interest, and a Security Deed was filed with the Court indicating, in part, that TRC and the Jacksons held collateral on the promissory note of 4,873 UDIs. A true and correct copy of this Security Deed is attached hereto as **Exhibit C**.

51.    The Jacksons and TRC thus claimed a security interest in 4,873 UDIs, even though they had sold many more than 1,000 UDIs.

52.    On November 1, 2001, TRMR and TRC executed and filed with the Court a modification of the Jacksons' security interest, then claiming to release 1,000 UDIs from such security interest. A true and correct copy of the Modification Agreement is attached hereto as **Exhibit D**.

53.    Ostensibly, this release of 1,000 UDIs was to account for the approximate number of UDIs sold by the Jacksons from 1989 to 1999 to the Maloneys and others

similarly situated. However, in the Related Action, the Jacksons would later falsely contend that these UDIs were released to TRMR and not to the UDI owners.

54.    The Jacksons' security interest in the Resort does not reference or refer to any specific UDIs as released from the Jacksons' security interest in the Resort.

55.    Neither the Maloneys' Resort Ownership Interests nor those of others similarly situated were excluded from the sale of UDIs to TRMR, or, on information and belief, referenced or included in any documents evidencing the sale and transfer of the Resort from the Jacksons and TRC to TRMR.

56.    After the sale, the Jacksons were fully aware that TRMR continued to sell UDIs to new purchasers to fund the monthly note payments, but TRC and the Jacksons did not release any such purchasers or other holders of Resort Ownership Interests from their security interest in the Resort.

**E.    The Resort from 1999 to 2004**

57.    From April 1999 to April 2004, the Jacksons and TRC were paid $28,194.07 in note payments every month, for a total amount of revenue from such sales to the Jacksons and TRC in excess of $1,680,000.

58.    Then, beginning in 2004, following litigation and a settlement agreement between TRMR, the Jacksons, TRC, and others, TRC and the Jacksons received

nearly $17,900 per month in note payments until 2014, for a total amount in excess of $2,148,000.

59.     Accordingly, from 1999 to 2014, the Jacksons received in excess of $3,360,000 in payments made to them under the promissory note.

## F.     The Dispossessory

60.     The Jacksons and TRC purported to foreclose on their security interest in the Resort in 2014, and later demanded and received from the Rabun County Superior Court an order dispossessing the Maloneys and all other holders of Resort Ownership Interests.

61.     Within a day or two of such order, which was filed on August 19, 2014 (the "Dispossessory Order"), the Jacksons removed all persons from the premises and locked all access points to the Resort to prevent anyone, including the Maloneys and other holders of Resort Ownership Interests, from entering the Resort.

62.     Since the Dispossessory Order, TRC and the Jacksons have not honored the Maloneys' Resort Ownership Interests or those of others similarly situated, even though all such people validly paid for and obtained their Resort Ownership Interests.

63.     After the Dispossessory Order, the Maloneys and others similarly situated have repeatedly requested access to the Resort and have asked that they be allowed

to exercise their Resort Ownership Interests, but they have been repeatedly, repetitively, and separately denied their rights to exercise such Interests by the Jacksons and the Gayle Parties (at the Jacksons' behest).

### G.   The Jackson Claim to Own and Possess the Entirety of the Resort and Commit Wrongful Acts to Accomplish this Result

64.   On September 14, 2016, Mrs. Jackson gave a deposition in the Related Action. She testified that TRC and the Jacksons refused to honor any UDI interests after the Dispossessory Order was entered, even as to people like the Maloneys, who had validly purchased their Resort Ownership Interests and even paid "dues for life."

65.   Mr. Jackson gave a deposition in the Related Action on September 23, 2016. Mr. Jackson testified that after the Dispossessory Order, TRC and the Jacksons "owned every bit of it," meaning the entirety of the Resort, which would necessarily include all interests of those holding valid Resort Ownership Interests.

66.   A few weeks after the Jacksons' deposition, they sent a letter to those they believed were holders of Resort Ownership Interests. A representative copy of this letter, which was sent to one such individual, is attached hereto as **Exhibit E**.

67.   In the Related Action, the Jacksons and TRC supplied the names of the people they believed to be valid holders of Resort Ownership Interests. A true and correct

copy of the list as submitted by TRC and the Jacksons is attached hereto collectively as **Exhibit F**.

68.     Among other reasons, the letter attached as **Exhibit E** falsely states that each such individual was "obligated and responsible for the property tax years of 2013, 2014, 2015, and 2016 along with maintenance, assessments, renovations, day-to-day operations, and special assessments for the years 2014 to present."

69.     The Jacksons and TRC further demanded each such individual pay "$8,600 on or before November 1, 2016," which was just two weeks after the date of the letter. And, if each such individual did not comply, TRC and the Jacksons would foreclose on their UDI and the matter would "be turned over to collections and all other legal rights at our disposal. [sic]"

70.     Alternatively, each such individual could simply sign and return a quit claim deed of their UDI.

71.     Not surprisingly, most people who received the letter in fact returned to TRC and the Jacksons a quit claim deed.

72.     At the trial of the Related Action, Mrs. Jackson testified that TRC and the Jacksons had no reasonable basis for claiming $8,600 as the amount due and intended that all such individuals who received this letter would return to them an executed quit claim deed.

-19-

73.    Up until this point (that is, from the Dispossessory Order to the date of this letter, October 12, 2016) TRC and the Jacksons had ignored all inquiries and demands of the holders of Resort Ownership Interests. Indeed, as to those who had paid dues for life, Mrs. Jackson testified in her September 2016 deposition that they "hear it on a daily basis now." Thus, the Jacksons, having tired of dealing with such people, elected to scare them off by the false and predatory letter attached hereto as **Exhibit E**.

74.    In the Related Action TRC and the Jacksons produced a small number of accounting documents of TRC, as well as TRC's tax returns for 2015 and 2016. The Jacksons did not produce tax returns thereafter claiming they had not yet been prepared by the time of the August 2019 trial.

75.    TRC and the Jacksons largely refused to produce backup or evidentiary support for the numbers contained in such accounting documents.

76.    A true and correct copy of TRC's Profit & Loss statement for 2016 is attached hereto as **Exhibit G**. Among numerous other indicia of wrongful conduct, this P&L shows "Commissions" paid by TRC of $156,041.16.

77.    A true and correct copy of TRC's 2016 tax returns is attached hereto as **Exhibit H**. The identical number of $156,041.16 is referenced as "Commissions" at Line 19 – Other Deductions of the 2016 tax returns.

78.     Likewise, TRC's general ledgers for 2016 show money flowing from TRC to Dana Pacciotti and Shea Smith, the Daughters, categorized as "Commissions." A true and correct copy of the applicable pages of the General Ledger are attached hereto as **Exhibit I**.

79.     TRC and the Jacksons have always admitted the Daughters do not work for the Resort whatsoever.

80.     The accounting documents and tax returns for TRC for 2015, 2017, 2018, and 2019 produced in post-judgment discovery in the Related Action are all similar in that they show Commissions flowing to the Daughters as expenses of TRC.

81.     At the trial of the Related Case in August 2019, Mrs. Jackson then claimed that the Daughters had never been paid commissions and that such amounts should have been "coded" for accounting purposes as loans from the Daughters. Mrs. Jackson thereby stated that the Jacksons had been untruthful in their prior testimony and by filing false tax returns.

82.     Then, in February 2020, in a post-judgment deposition, Mrs. Jackson then testified that all of TRC's tax returns dating back to 2015 were false in their entirety because all money earned from the Resort flowed not through TRC but instead through River Falls.

83.    In this same deposition, Mrs. Jackson also falsely testified that the Daughters have always owned 100% of the shares in River Falls. Incredibly, Mrs. Jackson claimed their accountant simply erred and should have filed everything under River Falls' tax returns. On information and belief, no tax returns for River Falls exist.

### H.    The Gayle Parties' Involvement

84.    In 2015 and 2016, the Gayles, acting in their individual capacities, began to assist the Jacksons' money-making efforts at the Resort.

85.    "Windy Sky Rentals" was a d/b/a of the Gayles until sometime in 2017.

86.    The Gayles in 2015 and 2016 and the Gayle Parties beginning in 2017 have aided, abetted, and assisted the Jackson Parties in their wrongful exclusion of the Maloneys and others similarly situated from the Resort, and have helped prevent such people from exercising their Resort Ownership Interests.

87.     The Gayle Parties run the Resort for the Jackson Parties by performing all day-to-day business operations of the Resort and thereby assist the Jackson Parties in treating the Resort as the Jackson Parties' private possession.

88.    The Gayle Parties currently perform leasing, maintenance, operations, security, and marketing and related activities at the Resort. The Resort is open to the general public. Patrons are charged various short and long-term rental rates for the

Resort's campsites, on-site camper units, on-site RVs, treehouses, cabins, and other amenities located on the Resort.

89.    The Gayles are signatories on bank accounts used in transacting Resort business, including accounts used jointly be the Gayle Parties and one or more of the Jackson Parties.

90.    The Gayle Parties assist the Jackson Parties in exchange for a kick back or percentage share in the money earned from the Resort through leasing contracts and secret side deals between the Gayles and the Jacksons.

### I.    Profits from the Resort are Funneled to River Falls and then to the Daughters

91.    Until sometime in 2016, River Falls was, like Windy Sky Rentals, a d/b/a and was not incorporated as a valid legal entity.

92.    Now, to one degree or another, the Gayle Parties and the Jackson Parties all participate in the profits, control, money-making efforts, and income of the Resort. According to Mrs. Jackson, this money is now partially funneled into River Falls and then wrongfully redistributed from there.

93.    Defendants take these actions to the exclusion of the Maloneys and others similarly situated. As will be shown by the evidence in this case, the money-making efforts at the Resort have been extremely lucrative and have resulted in a windfall to all Defendants in varying degrees.

94.     Ironically, the two Defendants who do no work for or on behalf of the Resort, the Daughters, now receive a substantial benefit from these lucrative money-making operations at the Resort, allegedly through their shares in River Falls, which Mrs. Jackson claims to have transferred to them between August 2019 and February 2020.

### J.     The Maloneys and Others Similarly Situated Continue to Assert their Resort Ownership Interests

95.     At all times from October 7, 1989, when the Maloneys obtained their Resort Ownership Interests up until the Dispossessory Order, when the Maloneys and all others similarly situated were wrongfully dispossessed of their Resort Ownership Interests, the Maloneys and others similarly situated were active and enthusiastic participants in the Resort.

96.     The Maloneys and others like them paid all dues and assessments (even "dues for life") and had remained Members in the Resort in good standing at all times since they obtained their Resort Ownership Interests.

97.     The Maloneys and others similarly situated have demanded that the Jacksons and TRC honor and defend their Warranty Deeds and permit them to exercise their other Resort Ownership Interests, but the Jackson Parties have continually, repetitively, and separately failed and refused to do so.

**K.     The Covenants**

98.     Covenants have been recorded against the Resort on three occasions, in 1984, 1994, and 1999.

99.     In the Related Action, the Jacksons and TRC took the position that of the three sets of covenants recorded on the Resort property, the 1994 Covenants control. The Jacksons and TRC contend that in 1994 they simply recorded over the 1984 Covenants.

100.   The Jacksons successfully obtained summary judgment in their favor on the issue of the controlling covenants in the Related Action.

**L.     Specific Provisions of the 1994 Covenants**

101.   TRC is the Declarant under the 1994 Covenants. Yet, TRC has violated or otherwise failed to fulfill its role as Declarant in all respects and has in fact ignored such role since the Dispossessory Order and earlier.

102.   In summary and pertinent part, in Article I(A), the 1994 Covenants provide that "each Undivided Interest in the Property shall be shared in common with all Members." A true, correct, and certified copy of the 1994 Covenants is attached as **Exhibit J**.

103.   The 1994 Covenants provide that the Declarant thereby imposes "upon such Property and such Undivided Interest therein mutual and beneficial restrictions,

-25-

covenants, conditions, and charges under a general plan for the benefit of all owners of such memberships and undivided interests and future owners of the same."

104.   The 1994 Covenants provide that they "shall be enforceable *inter alia* by injunction, pursuant or other proceedings at law or in equity against any present or future party or parties infringing, violating, or attempting to infringe or violate" the interests of the holders of the Resort Ownership Interests.

105.   The 1994 Covenants provide that a separate entity, "Tallulah River Resort Club, Inc., a Georgia not-for-profit corporation," is to be organized to manage and operate the Property for the benefit of its members, who shall be the owners of the 5,000 membership and undivided interests, including the Declarant.

106.   The Property "shall be used solely for recreation, including camping, picnicking, hiking, boating, fishing, swimming, sports, and other recreational uses authorized by Tallulah River Resort Club, Inc.," also defined therein as the "Club." (1994 Covenants, Article II(A)).

107.   The Club is permitted to "enter into leases or license agreements with third parties which permits such third parties to operate food services or convenience store establishments or other concessions within the Resort. Any income derived by the Club from such operations, leases, or license agreements shall become the property of the Club…" as further set forth therein. (Article II(A); Article V(B)).

108.   Further, a "non-exclusive and reciprocal right and easement is reserved to each member to use and enjoy each and every portion of the property described herein…subject to payment of all dues and assessments levied by the Club against the Member and subject to the Declaration and the Club Guidelines and Rules established by the Club." (Article II(C)).

109.   Likewise, "[n]o portion of the Property described herein shall be used in such manner as to obstruct or interfere with the enjoyment of Members…" (Article II(D)).

110.   Further as to the Tallulah River Resort Club, Inc., it was "created to manage and operate the Property for the mutual benefit of the members in accordance with these Restrictions. No other official or unofficial organization with or among the membership shall be formed, organized, or permitted for recreational or any other purpose." (Article III(A)).

111.   Each owner of a UDI became a Member of the Tallulah River Resort Club, Inc. by virtue of such ownership. (Article III (B)).

112.   The 1994 Covenants specifically state that "[t]he Club and its successors or assigns shall have the sole and exclusive right and duty to manage, operate, control, replace, or restore all of the improvements, equipment [etc.] on the Property." Further, "[t]he Club in its sole and absolute discretion…shall have authority and

power to…" perform all business-operational functions and management of the Resort. (Article III(D)(E)(1)-(18)).

113.   Ultimately, and perhaps most significantly, the 1994 Covenants provide that the Property "shall not be used in any manner which would unreasonably interfere with use of the Property as a membership campground." (Article XIV).

114.   The 1994 Covenants is a document filed with the Rabun County Clerk of Court and is signed under seal.

115.   Tallulah River Resort Club, Inc., was administratively dissolved effective August 24, 2017. There is no indication that TRC (the putative Declarant) or the Jacksons, in any capacity, individually or through another entity such as River Falls, has attempted to reinstate or otherwise direct the operation of the Club.

## CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure. The class is composed of all persons who have valid Resort Ownership Interests, and who have been deprived and stripped of such Resort Ownership Interests, as set forth herein.

117.   The class is likely to be composed of those persons who were, at the time of the dispossession, Members in good standing with the Club and who thereby enjoyed

valid Resort Ownership Interests, as well as those persons who were purchasers of Resort Ownership Interests from 1989 through 1999, as all such individuals would necessarily be excluded from whatever foreclosure rights the Jacksons and TRC claim to have possessed in 2014. Plaintiffs show that the approximate size of the class is likely to be between 50 to 300 people.

118.   The class of persons sought to be represented by the named Plaintiffs is so numerous that joinder of all members of such class is impracticable.

119.   There are questions of law and fact common to the class; namely, whether the putative plaintiffs have valid and enforceable Resort Ownership Interests, and if so, whether they have wrongly been deprived of their Resort Ownership Interests based on Defendants' misconduct, as stated herein.

120.   The claims of the Maloneys are typical of those of the class, in that the Maloneys have demonstrated their valid Resort Ownership Interests and further that they have been damaged as a direct and proximate result of Defendants' misconduct, as set forth herein.

121.   The Maloneys, along with such other putative plaintiffs/class members, have claims against Defendants as plead in Paragraphs 1 - 115 herein.

122.   Questions of law and fact common to the claims of the Maloneys are typical of the claims of the class of persons they seek to represent.

-29-

123.   The named representative Plaintiffs will fairly and adequately represent the interest of the class of persons they seek to represent and have engaged proper legal counsel to pursue the class litigation. Therefore, the Maloneys will fairly and adequately protect the interests of the class.

124.   In addition, Defendants have acted on grounds that are generally the same as to all members of the class, thereby making final relief appropriate with respect to the class as a whole.

125.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to the individual members of the class.

126.   Questions of law and fact common to the class predominate over any other questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

127.   The Maloneys are aware of one other class member with substantially similar claims commenced suit in the Superior Court of Rabun County, Georgia. Plaintiffs will request the consolidation of such action with this class and, on information and belief, such party desires to assert a class claim in this proceeding in this Honorable Court.

128.   It is desirable to concentrate the litigation of the claims in this forum since corporate entities and the Resort itself are all located in Rabun County, Georgia, which sits within this District and this Division, and available records and witnesses should reside or be accessible in this forum.

129.   Finally, management of a class action will not be difficult because the class and the identities and addresses of its individual members should be determined by Defendants' records, publicly available records, and records already produced in the Related Action.

## COUNT I – BREACH OF RESORT OWNERSHIP INTERESTS AGAINST TRC AND THE JACKSONS

130.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 115, above, as if restated verbatim herein.

131.   As set forth above, Plaintiffs have interests in the Resort, which are contained within their real property Undivided Interests, their Warranty Deed, the Covenants which run with the Resort, the related Agreement of Co-Tenancy, and their Member Interests in the Resort, as has been defined herein collectively as the Resort Ownership Interests.

132.   Plaintiffs and others similarly situated have been evicted, dispossessed, and stripped of their Resort Ownership Interests.

133.   The Jacksons and TRC, as the Declarant, have breached all the Declarant's required obligations under the 1994 Covenants by failing and refusing to operate the Resort as a membership campground. All of the Maloneys' Resort Ownership Interests and those of similarly situated people are thereby rendered meaningless by TRC's and the Jacksons' breach of the Covenants by refusing to run the Resort as a membership campground and instead treating the Resort as their own private possession, which they use for their own wrongful benefit and the wrongful benefit of the other Defendants.

134.   TRC and the Jacksons repeatedly, separately and distinctively have and continue to breach the 1994 Covenants by refusing to honor and follow the Covenants, despite the Maloneys' and others' demands that they be permitted to use the Resort as a membership campground.

135.   By refusing to honor and follow the Covenants, TRC and the Jacksons have also thereby breached the Purchase Contract with the Maloneys and others similarly situated, the Co-Tenancy Agreement with the Maloneys and all other similarly situated, and the Warranty Deed and other valid real estate interests in UDI ownership owned by the Maloneys and others similarly situated.

136.   As a direct and proximate result of these breaches, the Maloneys, and all others similarly situated, have and will continue to suffer damages in amounts to be proven at the trial of this case.

137.   All Defendants have wrongfully profited by such breaches and should be made to disgorge all such ill-gotten gains.

## COUNT II – ACTUAL FRAUD
## AGAINST TRC AND THE JACKSONS

138.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 115, above, as if restated verbatim herein.

139.   TRC and the Jacksons have engaged in actual fraud, involving moral guilt and artifice, to deceive the Maloneys and others similarly situated and rob them of their Resort Ownership Interests.

140.   TRC and the Jacksons intended from the inception of their relationship with the Maloneys and others similarly situated that they would never relinquish a single UDI or other *bona fide* interest in the Resort.

141.   TRC and the Jacksons knew when they sold the Resort to TRMR and participated in the wrongful dues-buyout program that title to all UDI interests in the Resort would never be clear.

142.   The intention of TRC and the Jacksons was to obtain as much money as possible on note payments, which the Jacksons and TRC knew could never be

-33-

sustained, especially after the Jacksons profited from the wrongful dues-buyout program.

143.   Then, when such payments could no longer be made, TRC and the Jacksons knew they would seize the Resort for themselves, evict and dispossess all valid holders of Resort Ownership Interests, and keep the Resort for themselves, outright and in fee simple.

144.   TRC and the Jacksons knew from the inception of their relationship that with the Maloneys and others similarly situated that the representations concerning the validity of UDI ownership interests, Warranty Deed rights, representations under the Purchase Contract, all representations and warranties in the Covenants, as well as the Agreement for Co-Tenancy were false, illusory, and would never be honored by TRC and the Jacksons. This is apparent, *inter alia*, by the false indications on the Security Deed (**Exhibit C**) and the Modification Agreement (**Exhibit D**) wherein the UDIs are misrepresented.

145.   The Maloneys and others similarly situated relied on the representations contained and embodied within their Resort Ownership Interests, as set forth therein. Among other reasons, such reliance was justified by the Maloneys and other similarly situated by virtue of such documents, information, and materials provided

-34-

by the Jacksons and TRC to the Maloneys and others similarly situated concerning their purchase of valid Resort Ownership Interests.

146.   Such reliance was to the detriment of the Maloneys and others similarly situated because they have now been dispossessed and excluded from the Resort, deprived of their financial investments in the Resort, and otherwise stripped of all Resort Ownership Interests.

147.   The statements and omissions of material fact made by TRC and the Jacksons, which are embodied within the documents creating the Resort Ownership Interests, and numerous other facts plead herein, demonstrate the wrongful bent of mind of TRC and the Jacksons.

148.   After the Dispossessory Order, the Jacksons continued with their fraudulent scheme by wrongfully demanding money from those holding valid Resort Ownership Interests, such as is described in the false and predatory letter (**Exhibit D**), which was sent to scare and discourage anyone from asserting their Resort Ownership Interests and opt instead to just give in to the Jacksons. This was the Jacksons' admitted goal.

149.   As a direct and proximate result of the fraud stated herein, the Maloneys and others similarly situated have suffered numerous losses and damages, including monetary damages in an amount to be proven at the trial of this case.

150.   The Maloneys and others similarly situated shall be entitled to punitive damages for the intentionally wrongful conduct of TRC and the Jacksons, working in collusion with one another, as well as for the reimbursement of all attorneys' fees, costs, and expenses as a direct and proximate result of such actual fraud.

## COUNT III – AIDING AND ABETTING FRAUD AGAINST RIVER FALLS, THE GAYLE PARTIES AND THE DAUGHTERS

151.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 115, above, as if restated verbatim herein.

152.   Through collusion and aiding and aiding TRC and the Jacksons, the other Defendants, River Falls, the Gayle Parties and the Daughters, have joined in further perpetrating and carrying out the Jacksons' fraud, which has resulted in wrongful gain and profit to all Defendants in varying degrees, to be shown by the evidence adduced in discovery in this case.

153.   Defendants have wrongfully obtained money and other improper benefits by their involvement in the Resort and have used such funds for their own private enrichment. The income from the Resort was to be paid to the Club under the 1994 Covenants, for the benefit of all holders of Resort Ownership Interests and was never to be paid to Defendants.

-36-

154.   TRC, the Jacksons, River Falls, and the Gayle Parties have used all of the common property, including the clubhouse, the office, the cabins, the pools, the campsites, and all other related amenities and infrastructure of the Resort, in their money-making efforts for their own private gain instead of for the benefit of valid holders of Resort Ownership Interests.

155.   All Defendants have wrongfully received money and other benefits to which they are not entitled and which they have converted for their own use as a result of such wrongful conduct.

156.   All Defendants have demonstrated collusion among one another to the end of wrongfully receiving money and benefits to which they would not otherwise be entitled.

157.   The Jackson Parties and the Gayle Parties have entered into both overt and secret agreements whereby the Gayle Parties are allowed to obtain separate interests in the Resort, oversee the Resort, and direct the day-to-day operations and control over the Resort such that the Gayle Parties can exclude the Maloneys and others similarly situated, and further ensure that Defendants are improperly enriched.

158.   As a direct and proximate result of the collusion by River Falls, the Gayle Parties and the Daughters in aiding and aiding TRC's and the Jacksons' fraud stated herein, the Maloneys and others similarly situated have suffered numerous losses

and damages, including monetary damages in an amount to be proven at the trial of this case.

159.  The Maloneys and others similarly situated shall be entitled to punitive damages for the intentionally wrongful conduct of all Defendants, working in collusion with one another, as well as for the reimbursement of all attorneys' fees, costs, and expenses as a direct and proximate result of such actual fraud.

## COUNT IV – RACKETEERING AND VIOLATION OF
## FEDERAL CIVIL RICO ACT

160.  Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 115, above, as if restated verbatim herein.

161.  All Defendants, in collusion with one another, have engaged in a common design and scheme, positively or tacitly, whereby they agreed to take for themselves the entirety of the Resort and all revenue derived therefrom, and to deprive the Maloneys and others similarly situated of their valid Resort Ownership Interests; and, through their mutual understandings, all Defendants have colluded to accomplish the fraud and other unlawful designs, as set forth herein.

162.  An agreement among Defendants, as co-conspirators, must be inferred from the circumstances set forth herein; namely, the behavior of all Defendants in sharing in the Resort's income and profits, the close relationship of these parties, the mutual

interests of the co-conspirators; and, other circumstances to be revealed through discovery, investigation, and shown at the trial of this case.

163.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 115, above, as if restated verbatim herein.

164.   Having devised a scheme or artifice to defraud and obtain money and property by means of false and fraudulent pretenses and representations, TRC and the Jacksons, for the purpose of executing such scheme or artifice or attempting to do so, placed in a post office or authorized depository for mail matter the letters, a representative example of which is attached as **Exhibit E** hereto, to the numerous people referenced in **Exhibit F** hereto, which were sent and delivered by the U.S. Postal Service.

165.   TRC and the Jacksons, having devised a scheme to defraud the Maloneys and others similarly situated, and in the commission of such scheme to defraud, by use of the mail for purposes of executing or attempting to execute the scheme, have committed the crime of mail fraud pursuant to 18 USC 1341.

166.   Simply stated, the Jacksons have engaged in fraud, with the intent to defraud, and have used the mail in furtherance of that scheme.

167.   The Jackson Parties, having devised a scheme to defraud the Maloneys and others similarly situated for obtaining their money and property by means of false or

fraudulent pretenses, have repeatedly transmitted wired funds across state lines and in interstate commerce in the form of the false "Commission" payments to and from Tennessee and Georgia for the purpose of executing such scheme.

168.   The Jackson Parties, having devised and engaged in a scheme to defraud Plaintiffs, and in the commission of such scheme to defraud, by use of false and fraudulent pretenses, and in transmitting wired funds to and from the States of Georgia and Tennessee, have committed the crime of wire fraud pursuant to 18 USC 1343.

169.   Simply stated, the Jackson Parties have engaged in fraud with the intent to defraud, and have transmitted in wire such writings, signs, and signals in furtherance of that scheme.

170.   Plaintiffs have set forth factual averments demonstrating a web of relationships between all Defendants and a consistent pattern and practice of fraud and collusion.

171.   The way in which the entire Resort enterprise is run is wrongful. Accordingly, the RICO enterprise in this case is the Resort itself.

172.   Specifically, the Resort could certainly be run in a non-fraudulent manner by simply operating it as a membership campground pursuant to the Covenants. Instead,

the Resort is run by Defendants through fraud and collusion with one another for their own private and ill-gotten gains.

173.   The criminally wrongful conduct amounting to Mail Fraud and Wire Fraud, as specifically plead herein, occurred on hundreds of occasions with such false and predatory letters as depicted in **Exhibit E** going out in the mail hundreds of times over.

174.   Likewise, the criminally wrongful conduct amounting to Wire Fraud likely occurred on hundreds of occasions, with the known examples of wire transfers of funds across state lines and outside and within Georgia of wrongful "Commission" payments to the Daughters.

175.   The Maloneys and others similarly situated were directly and financially harmed by the letters (**Exhibit E**) because such letters effectively dissuaded people from asserting their Resort Ownership Interests and thereby perpetuated the Jacksons' scheme to obtain the entire Resort for themselves, to the wrongful benefit of all other Defendants and to the exclusion of the Maloneys and others similarly situated.

176.   The Maloneys and others similarly situated were directly and financially harmed by the payments made as "Commissions" because all such funds have been

paid by and  through the Club, which was established to operate the Resort for the benefit of the Members and to otherwise prevent these types of wrongful payments.

177.   This pattern of racketeering activity has and continues to affect interstate commerce because, *inter alia*, valid holders of Resort Ownership Interests come from different states, and money and various communications as between and among Defendants, cross state lines, and all manner of goods and products used at the Resort travel over state lines.

178.   Accordingly, Plaintiffs plead Section 1962(c), as set forth herein. In addition, because Plaintiffs have been injured by the conspiracy to violate Section 1962(c) Plaintiffs also assert Section 1962(d) to ensure that all Defendants named herein are properly before this Court as participants in the RICO enterprise.

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

(a)     An award of damages in amounts to be shown at the trial of this case;

(b)     That the Court grant class action status in this matter for the reasons set forth in Paragraphs 116 – 129 herein;

(c)     That the Court permanently enjoin Defendants from interfering with Plaintiffs' Resort Ownership Interests as defined herein; and,

(d)      That the Court require Defendants to disgorge all ill-gotten gains obtained as a result of their misconduct described herein;

(e)     Such other and further relief as this Court deems just and proper.

Respectfully submitted this 19th day of August 2020.

**BLASINGAME, BURCH, GARRARD & ASHLEY, PC**

*/s/ Robert S. Huestis*

_____
Robert S. Huestis
Georgia Bar No. 374740
***Counsel for Plaintiffs***

P.O. Box 832
Athens, GA 30603
706-354-4000
rhuestis@bbga.com

-43-