# EXHIBIT C

⚜ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
RABUN COUNTY, GEORGIA

**2014-CV-0150**

**MAY 31, 2016 01:53 PM**

Holly E. Henry-Perry, Clerk
Rabun County, Georgia

IN THE SUPERIOR COURT OF RABUN COUNTY
STATE OF GEORGIA

| | |
|---|---|
| TALLULAH RIVER CO., INC. A/K/A TALLULAH RIVER COMPANY )<br><br>Plaintiff, )<br><br>vs )<br><br>NORTH GEORGIA MOUNTAIN INVESTMENT GROUP, LLC and TALLULAH RIVER MOUNTAIN RESORT, INC. AND OTHER TENANTS IN POSSESSION, )<br><br>Defendants, )<br><br>vs )<br><br>PATRICIA JACKSON and RANDY JACKSON, )<br><br>Third-Party Defendants. ) | CIVIL ACTION<br>FILE NO. 2014-CV-0150-C |

## DEFENDANTS' VERIFIED FIRST AMENDED COUNTERCLAIM AND FIRST THIRD-PARTY CLAIM

COME NOW Defendants/Plaintiffs-in-the-Counterclaim/Third-Party Plaintiffs, NORTH

GEORGIA MOUNTAIN INVESTMENT GROUP, LLC and ROBERT A. THOMSEN (AS

OTHER TENANT IN POSSESSION) (hereinafter, "NGMIG" and "Mr. Thomsen"), and pursuant

to OCGA § 9-11-15, amend their Counterclaim and add Third-Party Claims against Third-Party

Defendants PATRICIA JACKSON and RANDY JACKSON, and show the following.

NGMIG and Mr. Thomsen restate and incorporate herein by reference the allegations

contained in Paragraphs 1 to 11 of the Amended Counterclaim as if restated verbatim herein.

## ADDITIONAL STATEMENT OF FACTS

12.

In 1989, TALLULAH RIVER CO., INC. A/K/A TALLULAH RIVER COMPANY (hereinafter, "TRC") purchased undivided interests ("UDIs") in the 70+/- acres on Highway 441 in Rabun County, referred to herein as the "Campground." Specifically, TRC purchased 4,873 out of 5,000 total UDIs in the Campground.

13.

From 1991 to 1999, TRC sold no less than 1,000 UDIs to various individuals.

14.

In April of 1999, TRC purported to sell all UDIs owned by TRC to Mr. Myron Smith's company, Defendant TALLULAH RIVER MOUNTAIN RESORT, INC. (hereinafter, "TRMR") for approximately $3,000,000. The Warranty Deed, attached hereto as Exhibit A, mistakenly indicates in the legal description that TRC sold to TRMR 4,873 out of 500 UDIs at that time.

15.

In June 2001, Attorney Anthony Kirkland on behalf of TRC and its President Patricia Jackson, filed a Corrective Warranty Deed, attached hereto as Exhibit B, which purported to correct the legal description to 4,873 out of 5,000 UDIs. However, this too was an erroneous legal description because by that time, and as referenced in Paragraph 13, above, TRC had approximately 3,873 UDIs to sell. The Deed should have been fully corrected to reflect TRC's actual UDIs because, on information and belief, TRC had less than 3,900 UDIs to sell at that time.

16.

In November 2001, TRC and TRMR entered into a Modification Agreement, attached hereto as Exhibit C, which stated that the Deed to Secure Debt was corrected to reflect 3,873 out of 5,000 UDIs as securitizing the sale of the UDIs to TRMR.

17.

On information and belief, TRMR sold more than 1,000 UDIs from 1999 to 2004 to various individuals. Such UDI holders were treated as "Members" of the Campground who were permitted to use the facilities upon registering their usage with the TRMR management office. The notes generated from these sales were often pledged by TRMR to TRC to offset or reduce the approximate $28,000 per month mortgage payments made by TRMR to TRC.

18.

TRMR paid TRC more than $28,000 per month ostensibly to service the debt occasioned by the above-referenced purchase of the UDIs from TRC. These payments were made in cash and in "paper." As a way of servicing the debt, TRMR would deliver to TRC five-year notes generated from selling UDIs. TRMR discounted these notes from face value, and TRC accepted the notes as part of its monthly payments. TRC serviced these five-year notes such that if the notes went into default, TRMR would accept from TRC a return of the "bad" note, and would apply the open balance against new paper TRMR delivered to TRC. Once the individual debtors paid for their UDI interests, TRC and the Jacksons instructed TRMR to issue warranty deeds to the debtors.

19.

In 2003, Mr. Thomsen began purchasing paper from TRMR, which was represented to Mr. Thomsen as completely new and valid paper. Unfortunately, after Mr. Thomsen purchased

approximately $100,000 of paper in the fall of 2003, it was discovered that the paper had been "recoursed" and returned to TRMR by companies like TRC, "Fair Financial" and others. In other words, the paper had gone bad and was returned to TRMR under the recourse agreements. TRMR would repackage the old paper, provide the UDI purchasers with forbearance agreements on their delinquent payments, rewrite their bad paper to new current notes, and sell the repackaged paper to Mr. Thomsen. TRMR engaged in this scheme to generate cash to make its monthly payments to TRC.

20.

After this scheme was discovered, Mr. Thomsen agreed to buy twenty-percent of Mr. Smith's interests for $1 million. In November 2003, Mr. Thomsen, individually, purchased 1,000 UDIs from TRMR. The Warranty Deed of December 5, 2003, attached as Exhibit D hereto, indicates that UDIs identified as D3000 to D3999 were then transferred to Mr. Thomsen. Mr. Thomsen purchased these UDIs in exchange for a $1 million line of credit, which TRMR immediately began to draw down.

21.

In 2003 and 2004, Mr. Thomsen invested approximately $300,000 of his own money into the Campground, as well as significant time and effort. As a licensed general contractor at the time, he performed renovation work to an indoor pool, several infrastructure projects, and the renovation of numerous buildings and facilities at the Campground. Mr. Thomsen used his own money along with other member contributions to perform such work and make the improvements.

22.

TRMR had difficulty making the promissory-note payments of approximately $28,000 per month on its purchase of the referenced UDIs from TRC. As a result of these difficulties, and as a result of TRMR's sale of bad paper as referenced above, and as a result of other issues, various

-4-

disputes arose among the parties. In August 2004, an agreement (the "August 2004 Agreement") was reached in open court, with all terms memorialized by the transcript, attached hereto as Exhibit E. The 2004 Agreement states, among other things, that TRMR then owed $2,308,380 to TRC.

23.

TRC prepared an amended Secured Promissory Note on August 12, 2004, in accordance with the terms of the August 2004 Agreement, which required that TRMR would make 239 monthly payments of $17,896.67 to TRC, and a final payment of $17,898.50, with TRC to hold a first lien on the UDIs which TRMR had purchased from TRC in April 1999.

24.

Also pursuant to the August 2004 Agreement, Mr. Thomsen conveyed 700 UDIs back to TRMR via Quitclaim Deed, but kept 300 UDIs for himself. The August 2004 Agreement specifically provided that Mr. Thomsen's 300 UDIs were unassailable, not subject to TRC's lien on the TRMR UDIs, and therefore not subject to any alleged right of foreclosure by TRC.

25.

In 2004, it was determined that the "clubhouse" or main "Lodge" structure at the Campground had significant and extensive long-term structural defects, caused by the way in which the indoor pool and air had been treated, as well as by neglect to the roofing system and the structure as a whole of the Lodge. Mr. Thomsen found latent defects in the roofing structure.

26.

At the direction of Mr. Smith and TRMR, Mr. Thomsen built an entirely new roof system above the existing "pizza hut"-type roof structure. The indoor pool was drained, pool-pumping lines

were removed and updated to then-current health codes, and proposals were obtained to treat the air and former moisture barrier. Work was begun on tiling the walls and prepping for coatings.

27.

As more work was done, it became increasingly apparent that the mold and termite issues were more significant than first thought. Termite-eradication companies were brought out to deal with the termite issues, the offices were closed and walls were removed to eradicate the mold problems.

28.

At approximately the same time, the Georgia Department of Transportation was planning the widening of State Hwy. 441, which was to result in the loss of some front acreage next to the Lodge. The DOT was planning to shift Hwy 441 more than 100 feet to the east and within 10 feet of the Lodge. Accordingly, the renovation work on the Lodge and pool were completely stopped.

29.

When the DOT widened and shifted Hwy 441 at the Campground, the indoor pool and other parts of the Lodge were rendered unusable due to their proximity to the new road. Although Mr. Thomsen had expended considerable time, energy and expense on these items, after the 441 project was completed, the indoor pool area could only be used for storage. Portions of the upstairs area of the Lodge (above the indoor pool) were likewise no longer useable and therefore cordoned off from the Members. As some of these areas were not accessible, no longer in use, and out of sight, they were allowed to fall into disrepair.

30.

On February 7, 2006, TRMR executed and filed an Affidavit of Ownership, attached hereto as Exhibit F, for the purposes of inducing NGMIG to purchase its interests in the Campground. TRMR

quitclaimed to NGMIG its interest in no less than 2,500 UDIs at that time. NGMIG did not assume TRMR's debt. Instead, NGMIG agreed to raise the funds necessary to make the monthly mortgage payments to TRC for a period of up to a year and a half while Mr. Smith was going through a divorce and was away from the Campground.

31.

By this point. Mr. Thomsen, as the primary member of NGMIG and the individual holder of at least 300 UDIs, was unwilling to engage in the further sale of UDIs. He was concerned that the Jacksons and Mr. Smith had oversold the Campground's 5,000 UDIs, and was also concerned that any such UDIs would otherwise be subject to TRC's lien, as referenced above.

32.

Once the originally raised funds by NGMIG had been exhausted, Mr. Thomsen notified Mr. Smith that he needed to return as planned and resume the payments to TRC. Simply stated, the agreement was that TRMR would transfer 2,500 UDIs to NGMIG, and when Mr. Smith returned and restarted his sales operations, NGMIG would transfer back 1,250 UDIs to TRMR. Once Mr. Smith reengaged in sales, every deed he sold would be an NGMIG deed, and NGMIG would take the paper as payment of that deed. The other deeds that Mr.  Smith would sell would go to pay TRC.

33.

However, Mr. Smith did not return to the Campground or re-start sales, but instead filed for bankruptcy protection. At the end of the bankruptcy proceedings, NGMIG stepped back in to make payments from 2008 to 2014.  NGMIG made the monthly payments of $17,896.67 directly to TRC every month for the next ten years, until April 2014.

34.

From 2004 to 2014, NGMIG operated the Campground and continually maintained the property, the grounds, the structures and the facilities. Accordingly, either individually or through NGMIG, Mr. Thomsen performed a great deal of work and expended a great deal of money for and on behalf of the Campground during the eleven-year period from 2003 to 2014.

35.

Specifically, and by way of example only, Mr. Thomsen rebuilt the Bath Houses in the "A" and "B" areas of the Campground from mere cinder block/screen door structures to fully functioning restrooms, showers, etc.

36.

For the portions of the Lodge which remained useable after the Highway 441 widening, Mr. Thomsen rebuilt and entirely renovated the offices, the restaurant areas and the half baths. NGMIG also add three full bathrooms for use by NGMIG staff and others to a portion of the Lodge.

37.

The outdoor pool that was on the Campground property in 2003 was a "doe-boy" metal wall pool with a vinyl liner that had been sunk down into the ground. One of Mr. Thomsen's first projects was to demolish and remove the old pool and build a new guanite pool in its place. This entirely rebuilt pool remained clean, functional and frequently used by Campground Members until after NGMIG was improperly excluded from the Campground in 2014.

38.

NGMIG also purchased the "River Cabins," which were trailers and therefore properly considered personal property. NGMIG maintained these trailers and rented them to Members for weekend use.

39.

A smaller structure, the "Guard House" was either to be moved or demolished by the Georgia DOT. NGMIG therefore moved it to a different location on the property, and then renovated and repaired the structure.

40.

There are also several other smaller lodges on the property, which had been built in the 1980s. NGMIG renovated all of these structures. Onsite employees were permitted to live in these lodges at reduced rates to assist with the Campground's maintenance and security.

41.

In 2013, following his divorce from Sheila Thomsen, who also had been Mr. Thomsen's business partner in NGMIG and the Campground, Mr. Thomsen began to discuss with real estate agents and potential purchasers the sale of the UDIs owned by Mr. Thomsen, individually, as well as the sale of NGMIG's UDIs.

42.

Mr. Thomsen received a great deal of interest from potential purchasers. However, given the lack of clarity as to the precise number of UDIs held by the individual Campground Members and the parties to this case, it became increasingly difficult to determine whether and at what price these interests could be sold.

43.

NGMIG was responsible for collecting user fees, Member fees and levying assessments on Members and UDI-holders. NGMIG is the Declarant pursuant to the Campground's Covenants.

44.

In light of their concerns as to the Campground's ability to be sold, NGMIG sought forbearance from TRC so that the parties could reach a firm understanding as to the ownership of all issued and outstanding UDIs. Unfortunately, TRC refused. This, in turn, led NGMIG to cease making the monthly payments to TRC.

45.

TRC conducted a foreclosure of the Deed to Secure Debt on TRMR's interests in the Campground on June 3, 2014. TRC filed an Affidavit for Summons of Dispossessory naming TRMR, NGMIG "and other Tenants in Possession."

46.

Even though TRC refused to account for UDIs sold by TRC, and even though TRC refused to account for UDIs sold by TRMR and assigned to TRC, TRC proceeded with the foreclosure.

47.

Even though the Deed to Secure Debt pertained only to 3,873/5,000 UDIs, TRC proceeded to foreclose, purportedly, on 4,873 UDIs.

48.

Even though TRC had contractually agreed in the August 2004 Agreement to release and quitclaim to Mr. Thomsen, individually, the 300 UDIs which were not to be subject to foreclosure, TRC proceeded to foreclose, purportedly, on these 300 UDIs, as well.

-10-

49.

Even though the Warranty Deed was otherwise defective due to an erroneous legal description, TRC proceeded to foreclosure, purportedly on 4,873/5,000 UDIs.

50.

TRC never agreed with NGMIG, Mr. Thomsen or any of the other UDI holders, Members or "Tenants in Possession" that TRC could unilaterally seize and convert their items of personal property located on the Campground.

51.

Following the foreclosure and dispossession of all UDI holders other than TRC, TRC and its alter egos, Patricia Jackson and Randy Jackson, took and converted for their own usage numerous items of personal property which did not and do not belong to them.

52.

By way of example only, the River Cabins noted above, which are trailers and thus personalty were moved from one area in the Campground to the "C" area, where additional porches and other items were added to the River Cabins. Thereafter, the River Cabins have been used by TRC and the Jacksons, either directly or indirectly, as if such items were owned by them.

53.

NGMIG, Mr. Thomsen and numerous UDI holders and Members had personal possessions and property stored in the indoor pool area, in two large storage sheds, and in other areas throughout the Campground. TRC, Mr. and Mrs. Jackson and their agents, employees and representatives refused to allow the UDI holders to return to the Campground to retrieve their items of personal property. They were also prevented from obtaining their personalty because the Jacksons refused to put the

-11-

items of personal property in the front entrance of the Campground, as required by a standard eviction proceeding (if that is, in fact, what occurred here).

54.

On information and belief, TRC and the Jacksons deliberately set fire to one or more of the smaller lodges, which contained valuable personal property of several individuals, including UDI holders and Campground Members. TRC never agreed with NGMIG, Mr. Thomsen or any of the other UDI holders, Members or Tenants in Possession that TRC could destroy structures jointly owned as part of the co-tenancy relationship existing due to the UDI ownership interests.

55.

The Declarant's rights under the Campground's Covenants are vested in NGMIG. TRC does not have Declarant's rights. Until 2014, NGMIG and not TRC collected fees from the UDI holders pursuant to the Declarant's rights.

56.

Neither NGMIG nor Mr. Thomsen, individually, guaranteed the note on which the subject foreclosure was based.

57.

On April 30, 2014, TRC filed a Notice of Sale Under Power in Security Deed, which was the Deed to Secure Debt (the "DSD") recorded at Deed Book U-18, Pages 494-496, as modified by the November 1, 2001 Modification Agreement, filed December 14, 2001, which DSD included the erroneous legal description, "4873/500".

58.

The Deed Under Power of Sale was filed on June 3, 2014. This followed the purported foreclosure, which referenced the original conveyance of April 4, 1999 and the Modification Agreement of November 1, 2001, recorded on December 14, 2001, which purported to have the property purchased by TRC for $1,600,000.

59.

In September 2015, Mr. Thomsen came on to the Campground with the undersigned counsel to view the Campground property, review potential items of personalty moved or otherwise converted by the Jacksons, to discuss the layout, and to survey the damages done and the changes made to the property by TRC and the Jacksons.

60.

Upon attempting to exit the Campground, having stayed on the property no more than approximately thirty minutes, Mr. Thomsen found himself blocked in. He was prevented from leaving because Mr. Jackson had positioned his SUV at one exit and parked a truck at the other exit, thus blocking Mr. Thomsen inside the Campground. Over Patricia Jackson's protests, Mr. Jackson thus wrongfully detained and imprisoned Mr. Thomsen inside the Campground. Mr. Thomsen was not permitted to leave until after law enforcement was called to the scene.

**ADDITIONAL STATEMENT OF PARTIES AND JURISDICTION**

61.

TRC is subject to service of this Verified First Amended Counterclaim and the jurisdiction of this Court by virtue of filing this instant action and availing itself of the jurisdiction of this Court. Venue is properly laid herein.

-13-

62.

Patricia Jackson and Randy Jackson, husband and wife, have acted as the sole shareholders, sole directors and officers, and sole employees of TRC. Where TRC, Patricia Jackson and Randy Jackson have acted as alter egos of one another for the purposes of some of the conduct alleged in this lawsuit, the Jacksons should not be permitted the protections of TRC's corporate form.

63.

The Jacksons have also subjected themselves to individual liability in this action for, among other things, destroying personal property, structures and improvements subject to the co-tenancy relationship existing by virtue of the UDI interest; converting for their own use and enjoyment personal property, equipment and other items on the Campground which do not belong to them following the eviction/foreclosure/dispossessory proceedings; the wrongful imprisonment of Mr. Thomsen; and, the Jacksons' unjust enrichment by virtue of their conduct stated herein.

64.

The Jacksons may be served through their counsel, Sanders, Ranck & Skilling, PC, or by second original at their home address, 160 Red Oak Lane 160, Clarkesville, Georgia, Habersham 30523-2823. After such service of process, the Jacksons shall be subject to the jurisdiction of this Court with venue properly laid herein.

## ADDITIONAL COUNTERCLAIMS AND THIRD-PARTY CLAIMS

## COUNT II:  FRAUD

65.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations set forth hereinabove as if restated verbatim herein.

-14-

66.

TRC and the Jacksons have engaged in actual fraud, involving moral guilt and artifice, to deceive Mr. Thomsen and NGMIG and rob them of their rightful interests in the Campground.

67.

TRC and the Jacksons intended from the inception of their relationship with Mr. Thomsen, TRMR, NGMIG and other UDI holders that they would never relinquish a single UDI or other *bona fide* interest in the Campground.

68.

TRC and the Jacksons knew that clear title could never be obtained, thus preventing all UDI holders from transferring, selling or conveying their interests in the Campground, and thereby rendering the interests of all UDI holders illusory and a nullity.

69.

TRC and the Jacksons accepted payment for UDIs with no intention of actually transferring UDI interests in consideration for such payments.

70.

TRC and the Jacksons made representations concerning the validity of UDI interests to TRMR, NGMIG and Mr. Thomsen knowing that such representations were false.

71.

TRMR, NGMIG and Mr. Thomsen relied on these representations as set forth herein. Among other reasons, such reliance was justified by virtue of their longstanding business relationships with one another and the repeated nature of the UDI transactions.

72.

Such reliance was to the detriment of Mr. Thomsen and NGMIG. Specifically, they have been divested of their UDI interests, excluded from the Campground property, divested of their financial investments in the Campground, suffered the loss of their personal property, labeled as "trespassers" and falsely imprisoned inside the Campground, and robbed of eleven years of time and effort devoted by Mr. Thomsen and others to the Campground.

73.

The statements and omissions of material fact made by TRC and the Jacksons demonstrate a wrongful bent of mind. TRC and the Jacksons willfully and intentionally deceived NGMIG, TRMR and Mr. Thomsen with the intention that they would continue to make the payments set forth herein.

74.

As a direct and proximate result of the fraud stated herein, NGMIG and Mr. Thomsen have suffered numerous losses and damages, including monetary damages in an amount to be proven at the trial of this case. NGMIG and Mr. Thomsen also are entitled to punitive damages for the intentionally wrongful conduct, as well as reimbursement of all attorney's fees, costs and litigation expenses as a direct and proximate result the fraud.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, all interest, costs, attorneys' fees and punitive damages from TRC and the Jacksons, as well as any other relief that the Court deems just and proper on Count II.

## COUNT III:  ALTERNATIVE CLAIM FOR NEGLIGENT MISREPRESENTATION

75.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

76.

In the alternative, TRC and the Jacksons negligently supplied false information to TRMR, NGMIG and Mr. Thomsen which they knew or should have known was false; namely, that much of the UDIs were worthless and would never result in any true interest in the Campground.

77.

TRC and the Jacksons were manifestly aware of the use to which the information would be put and intended that it be so used; namely, that TRMR, NGMIG and Mr. Thomsen would continue to make the payments as referenced herein.

78.

The information supplied by TRC and the Jacksons was intended for TRMR, NGMIG and Mr. Thomsen and it was known and foreseeable by TRC and the Jacksons that they would receive the information.

79.

TRMR, NGMIG and Mr. Thomsen, as recipients of the information, relied on the information in making the subject payments to TRC, as referenced herein. It was the intention of TRC and the Jacksons to induce such reliance.

-17-

80.

The reliance by TRMR, NGMIG and Mr. Thomsen on the information was justifiable for the reasons previously set forth herein.

81.

As a direct and proximate result of the negligent misrepresentations, NGMIG and Mr. Thomsen have suffered and incurred actual and compensatory damages, and are entitled to reimbursement for such damages, punitive damages against TRC and the Jacksons for their grossly negligent or reckless conduct, as well as reimbursement of all attorney's fees, costs and litigation expenses, all in amounts to be shown at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, interest, costs, attorneys' fees and punitive damages against TRC and the Jacksons, as well as any other relief that the Court deems just and proper on Count III.

## COUNT IV:  CLAIM FOR BREACH OF CONTRACT

82.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

83.

As set forth herein, TRC was required to deliver 300 UDIs to Mr. Thomsen by the August 2004 Agreement. TRC agreed that these 300 UDIs would be unassailable, owned only by Mr. Thomsen, and not subject to any lien or right of foreclosure or possession by TRC or the Jacksons.

84.

TRC has breached the August 2004 Agreement by purporting to foreclose on 4,873 UDIs, which would necessarily include the 300 UDIs unquestionably owned by Mr. Thomsen.

85.

Mr. Thomsen has therefore been damaged as a direct and proximate result of this breach of contract, with damages to be shown with specificity at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, interest, costs, and attorney's fees against TRC, as well as any other relief that the Court deems just and proper on Count IV.

## COUNT V:  ALTERNATIVE CLAIM FOR *QUANTUM MERUIT*

86.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

87.

NGMIG and Mr. Thomsen assert in the alternative this *quantum meruit* claim.

88.

TRC agreed that NGMIG and Mr. Thomsen would have interests in the Campground. NGMIG made the payments and performed the work as referenced herein. NGMIG and Mr. Thomsen have received no value for their payments and hard work.

89.

NGMIG and Mr. Thomsen therefore have an alternative claim based on *quantum meruit* to recover the reasonable value of the work performed but for which they have received nothing in return.

90.

As a direct and proximate result of the misconduct of TRC and the Jacksons, NGMIG and Mr. Thomsen have suffered and incurred actual and compensatory damages, and are entitled to reimbursement for such damages, as well as reimbursement of all attorney's fees, costs and litigation expenses, all in amounts to be shown at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, all interest, costs, and attorneys' fees, as well as any other relief that the Court deems just and proper on Count V.

## COUNT VI: ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT

91.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

92.

To the extent that TRC and/or the Jacksons contend that the enforcement of the agreement existing between the parties is vague or otherwise enforceable, NGMIG and Mr. Thomsen refute such contentions; but assert, in the alternative, this claim for unjust enrichment.

93.

TRC agreed that TRMR, NGMIG and Mr. Thomsen would have interests in the Campground. They made numerous payments and performed a great deal of work and many other functions for and on behalf of the Campground, all which the parties agreed would constitute consideration for their interests in the Campground.

94.

NGMIG and Mr. Thomsen therefore assert this alternative claim based on unjust enrichment to recover the amount by which TRC and the Jacksons have been unjustly enriched by obtaining the financial advantages set forth herein.

95.

As a direct and proximate result of their misconduct, TRC and the Jacksons have been unjustly enriched, as measured from their standpoint, upon whom such benefits were conferred, together with attorney's fees, costs and litigation expenses incurred by NGMIG and Mr. Thomsen, all in amounts to be shown at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, all interests, costs and attorneys' fees, as well as any other relief that the Court deems just and proper on Count VI.

## COUNT VII:  CLAIM FOR SPECIFIC PERFORMANCE

96.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

97.

Mr. Thomsen brings this action for specific performance of the August 2004 Agreement to require TRC to convey his 300 UDIs, his individual ownership interests in the Campground.

98.

As set forth herein, it was agreed that NGMIG would have ownership interests in the Campground. NGMIG therefore also brings this action for specific performance to require TRC to convey an amount of UDIs commensurate with the payments made and the work performed for the Campground by NGMIG, and in order to equitably compensate NGMIG for its contributions to the Campground.

99.

NGMIG and Mr. Thomsen timely tendered their payments, services and other benefits to TRC, and demanded the conveyance of their interests as described in their agreements. NGMIG and Mr. Thomsen have paid and conferred more than sufficient amounts to obtain their interests. However, TRC has refused to make the conveyances.

100.

NGMIG and Mr. Thomsen therefore demand judgment that TRC be required to specifically perform the agreements and for damages as set forth herein, together with attorney's fees, costs and litigation expenses, all in amounts to be shown at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of specific performance, money damages, all interest, costs and attorneys' fees, as well as any other relief that the Court deems just and proper on Count VII.

## COUNT VIII:  CLAIM FOR CONVERSION

### 101.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

### 102.

TRC and the Jacksons have wrongfully converted numerous items of tangible personal property owned by NGMIG and Mr. Thomsen as set forth herein.

### 103.

TRC and the Jacksons have made no attempt to return such items of tangible personal property to NGMIG and Mr. Thomsen.

### 104.

The wrongful conversion by TRC and the Jacksons of items of tangible personal property owned by NGMIG and Mr. Thomsen has proximately resulted in injuries and damages to NGMIG and Mr. Thomsen in an amount to be proven at the trial of this case.

WHEREFORE, NGMIG and Mr. Thomsen are entitled to an award of money damages, all interest, costs and attorneys' fees, and punitive damages against TRC and the Jacksons as well as any other relief that the Court deems just and proper on Count VIII.

## COUNT IX:  CLAIM FOR WRONGFUL FORECLOSURE

### 105.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

106.

In an email dated April 14, 2014, counsel for the Jacksons and TRC, Mr. Ernest V. Harris, confirmed in writing that the 300 UDIs were to have been transferred by quitclaim deed to Mr. Thomsen. However, inexplicably, TRC has continually refused to release the 300 UDIs to him. Regardless, the foreclosure proceeding could not have occurred as to those 300 UDIs.

107.

By its own admissions contained in documents, TRC necessarily has less than 4,873 UDIs.

108.

NGMIG shows that it should be possessed of 1,250 UDIs, and the foreclosure proceeding could not have occurred as to those 1,250 UDIs.

109.

By their actions, TRC and the Jacksons have effectively treated the foreclosure as applying to all of the Campground. They have excluded all other UDI holders. They have treated the entirety of the Campground, including all facilities, structures, improvements, items of personal property, etc. located there as their own. TRC and the Jacksons have effectively toppled the co-tenancy arrangement at the Campground in favor of a sole, self-serving individual tenancy or fee-simple interest now held only by the Jacksons.

110.

Other problems with the foreclosure include the fact the amount on which the foreclosure was based was overstated. Pursuant to its letter of April 30, 2014, attached hereto as Exhibit G, the office of Sanders, Ranck & Skilling, P.C. was required to obtain verification of the debt, which it could not do because TRC could not accurately state the amount of UDIs on which the foreclosure was based.

111.

TRC has failed and continues to fail to account for the UDIs at issue in this case. Given the unresolved issues with the UDIs, the foreclosure could not have been proper. Simply put, TRC could not accurately state the amount of UDIs on which its foreclosure was based, thus destroying the foreclosure's validity.

112.

TRC owed NGMIG a duty to conduct the foreclosure sale fairly and in good faith.

113.

TRC breached the duty owed to NGMIG to conduct the foreclosure sale fairly and in good faith as set forth in the facts stated herein.

114.

The breach proximately resulted in harm to NGMIG. A causal connection exists between TRC's unfair conduct and the harm caused to NGMIG.

115.

TRC has inflicted damages in an amount to be proven at the trial of this case on NGMIG as a direct and proximate resulted of TRC's misconduct as set forth in the facts stated herein.

116.

NGMIG is entitled to an award of punitive damages for TRC's breach of its duty to conduct a foreclosure sale fairly and in good faith.

WHEREFORE, NGMIG is entitled to an award of money damages, all interest, costs and attorneys' fees, and punitive damages against TRC and the Jacksons as well as any other relief that the Court deems just and proper on Count IX.

## COUNT X:  EXPENSES OF LITIGATION

### 117.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

### 118.

As set forth herein, TRC and the Jacksons have acted in bad faith, have been stubbornly litigious, and have caused NGMIG and Mr. Thomsen unnecessary trouble and expense, entitling them to expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT XI:  PUNITIVE DAMAGES

### 119.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

### 120.

As set forth herein, TRC and the Jacksons have acted in bad faith, and engaged in willful misconduct, malice, fraud, wantonness, oppression and that entire want of care raising a presumption of conscious indifference to consequences entitling Pl NGMIG and Mr. Thomsen to general and punitive damages against NGMIG and Mr. Thomsen.

## COUNT XII:  CLAIM FOR FALSE IMPRISONMENT

### 121.

NGMIG and Mr. Thomsen restate and incorporate herein by reference all allegations contained hereinabove as if restated verbatim herein.

122.

As set forth herein, Randy Jackson and Patricia Jackson did commit the offense of false imprisonment in that they did confine and detain Mr. Thomsen, in violation of his personal liberty, without legal authority, contrary to the laws of this State, the good order, peace and dignity thereof.

123.

The false imprisonment by the Jacksons of Mr. Thomsen has proximately resulted in injuries and damages to Mr. Thomsen in an amount to be proven at the trial of this case.

WHEREFORE, Mr. Thomsen is entitled to an award of money damages, all interest, costs and attorneys' fees, and punitive damages against the Jacksons as well as any other relief that the Court deems just and proper on Count XII.

WHEREFORE, NGMIG and Mr. Thomsen pray as follows:

(a)     That the Third-Party Defendants be served with this First Amended Counterclaim and Third-Party Claim as provided by law;

(b)     That a trial by jury of twelve (12) persons be had on all issues so triable;

(c)     That NGMIG and Mr. Thomsen be collectively awarded their UDI interest of 26% of the total interests in the Campground;

(d)     That the Court award prejudgment interest from the date of the award through the date of entry of this Judgment, at the rate of prime rate plus 3%, all as provided by OCGA § 51-12-4;

(e)     That all damages, including punitive damages, together with attorneys' fees, interest, costs and expenses, be awarded to NGMIG and Mr. Thomsen in an amount to be determined at trial; and,

(f)    That NGMIG and Mr. Thomsen have such other and further relief as the Court may

deem necessary and just under the circumstances.


This 31st day of May, 2016.

**HUESTIS LAW, LLC**

ROBERT S. HUESTIS
Georgia Bar No. 374740


480 E. Broad Street
The Franklin House
Suites 116 & 102
Athens, Georgia  30601
(706) 549-7770
Rob@businesslawga.com

-28-

IN THE SUPERIOR COURT OF RABUN COUNTY
STATE OF GEORGIA

TALLULAH RIVER CO., INC. A/K/A )
TALLULAH RIVER COMPANY )
)
       Plaintiff, )
)
vs )
)
NORTH GEORGIA MOUNTAIN )    CIVIL ACTION
INVESTMENT GROUP, LLC and )    FILE NO. 2014-CV-0150-C
TALLULAH RIVER MOUNTAIN )
RESORT, INC. AND OTHER )
TENANTS IN POSSESSION, )
)
      Defendants, )
)
vs )
)
PATRICIA JACKSON and RANDY )
JACKSON, )
)
    Third-Party Defendants. )

## VERIFICATION

    I, ROBERT THOMSEN, representative for North Georgia Mountain Investment Group, LLC,

being duly sworn, under penalty of perjury, depose and say that I have read the foregoing pleading,

***Defendants' Verified First Amended Counterclaim and First Third-Party Claim***, and the facts

stated therein are from first-hand knowledge and true and correct to the best of my knowledge,

information and belief.

    This 31st day of May, 2016.

                                 ROBERT THOMSEN
                                 Representative for North Georgia Mountain
                                 Investment Group, LLC

Subscribed and sworn to before me
this 31st day of May, 2016

Notary Public

# EXHIBIT "A"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

Book U18 Page 491

After filing, mail to Carey Station Village, Inc., P.O. Box 1886, Clarkesville
GA, 30523 (706) 754-5764

RABUN ___County, Georgia
Real Estate Transfer Tax
Paid $ 1.00
Date MAY 18, 1999

STATE OF GEORGIA
RABUN COUNTY
I, THE UNDERSIGNED, Clerk of the Superior Court,
Rabun County, Georgia, DO HEREBY CERTIFY that the
within and foregoing is a true and correct copy of the
original as it appears on record and file in the Office
of the Clerk of Superior Court, Rabun County, Georgia.
Witness my hand and the Seal of Said Court
This the 25th day of June , 2014
Clerk Superior Court Holly E. Henry Berry
Rabun County, Georgia

STATE OF GEORGIA

COUNTY OF RABUN

### WARRANTY DEED

THIS INDENTURE, made this 4th  day of  April    in the year
of our Lord One Thousand Nine Hundred Ninty Nine    between

TALLULAH RIVER CO., INC.
of the County of Rabun  and State of Georgia   of the first part, hereinafter
called Grantor, and

TALLULAH RIVER MOUNTAIN RESORT, INC.

of the County of Rabun    and State of Georgia of the second part; hereinafter
called.Grantee (the words "Grantor" and "Grantee" to include their respective
heirs, successors, and assigns where context requires or permits).

WITNESSETH, Grantor, for and in consideration of the sum of One
Hundred Dollars and other Valuable Consideration, in hand  paid  at
and before the sealing and delivery of these presents, the receipt whereof is
hereby acknowledged, has granted, bargained, sold and conveyed and by these
presents does grant bargain, sell and convey unto the said party of the
second part, it's heirs and assigns, all the following described property,
to wit:

Attachment "A"

TO HAVE AND TO HOLD, The said bargained premises, together with all and
singular the rights, members and appurtenaces thereof, to the same being,
belonging or in anywise appertaining, to the only proper use, benefit and be-
hoof of  the Grantee      the said party of the second part, and
their heirs and assigns forever in Fee Simple.

491

492

And the said party of the first part, for it's heirs, executors and administrators, will warrant and forever defend the right and title to the above described property unot the said party of the second part it's heirs and assigns, against the claims of all persons whomsoever.

IN WITNESS WHEREOF the said party of the first part has here unto set it's hand and affixed it's seal the day and yeary first above written.

_____        _____ (SEAL)

_____ (SEAL)

_____ (SEAL)

MY COMMISSION EXPIRES 3-13-2001

*NOTARY SEAL*
*NOTARY SEAL*

Book 118  Page 493

A 4873/500 undivided interest in and to:

All that tract or parcel of land lying and being in
Land Lot 9 of the Fifth Land District of Rabun
County, Georgia, being more fully described as follows:

BEGINNING at an iron pin located at the intersection
of the Easterly boundary line of U.S. Highway 441
with the Southerly bank of Tallulah River, said iron
pin being located at the Northernmost bridge on U.S.
Highway 441 crossing the Tallulah River.  From said
beginning point thus established, run along and with
the top of the bank of Tallulah River the following
courses and distances:  North 32 degrees 52 minutes
East 356.1 feet to a point; thence along and with
the top of the bank of the river to a point located
North 18 degrees 37 minutes East 1,140.2 feet from
the last referenced point; thence North 10 degrees
03 minutes East 71 feet; thence North 13 degrees 27
minutes East 100.9 feet; thence North 35 degrees 32
minutes East 160.8 feet; thence North 55 degrees 45
minutes East 366.3 feet; thence South 80 degrees 12
minutes East 356.3 feet; thence South 39 degrees 56
minutes East 174.2 feet; thence South 20 degrees 06
minutes East 412.6 feet; thence South 11 degrees 42
minutes East 69.1 feet; thence South 02 degrees 44
minutes West 221.3 feet; thence North 81 degrees 20
minutes West 98.2 feet; thence South 26 degrees 20
minutes West 117.9 feet; thence South 11 degrees 17
minutes West 193.6 feet; thence South 08 degrees 31
minutes West 132.2 feet; thence South 09 degrees 57
minutes West 261.3 feet; thence South 08 degrees 47
minutes West 175 feet; thence South 21 degrees 40
minutes West 142.5 feet; thence South 34 degrees 09
minutes West 191.9 feet; thence South 30 degrees 40
minutes West 162.2 feet; thence South 37 degrees 19
minutes West 310.2 feet; thence South 33 degrees 19
minutes West 65.9 feet; thence South 46 degrees 34
minutes West 50.5 feet; thence along and with the bank
of said river to a point located South 44 degrees 10
minutes West 661.2 feet from the last referenced point;
thence North 80 degrees 25 minutes West 246 feet to a
point; thence North 86 degrees 00 minutes West 175.1
feet to an iron pin on the Northerly bank of the
Tallulah River, said iron pin being located on the
Easterly right of way of U. S. Highway 441; thence
North 02 degrees 07 minutes East 1,162.3 feet to
an iron pin and point and place of beginning containing
69.33 acres and being more fully described upon a plat
of survey prepared by William F. Rolader, Georgia
Registered Land Surveyor No. 2042, dated January 28,
1983, and recorded in the office of the Clerk of Rabun
Superior Court in Plat Book 18, Page 231.


EXHIBIT  "A"

RECORDED THIS THE 24TH DAY OF MAY, 1999  _____ , CLERK,S.C.

# EXHIBIT "B"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

After recording, please mail to Tallulah River Co., P.O. Box 1886, Clarkesville, GA. 30523

STATE OF GEORGIA
RABUN COUNTY
I, THE UNDERSIGNED, Clerk of the Superior Court,
Rabun County, Georgia, DO HEREBY CERTIFY that the
within and foregoing is a true and correct copy of the
original as it appears of record and file in the Office
of the Clerk of Superior Court, Rabun County, Georgia.
Witness my hand and the Seal of Said Court
This the 25th day of June 2014
Clerk Superior Court Rabun County, Georgia

Anthony Kirkland, Attorney at Law
707 Whitlock Ave., SW,
Building E, Suite 16
Marietta, GA. 30064
(770) 428-6380

## CORRECTIVE WARRANTY DEED

STATE OF GEORGIA
COUNTY OF COBB

Cross reference:
DB:U-18,Pg:491

THIS INDENTURE, made this 5th day of December, in the year of our Lord Two thousand between Tallulah River Company
and of the County of Habersham, and the State of Georgia, as party or parties of the first part, hereinafter referred to as GRANTOR, and Tallulah River Mountain Resort, Inc.,

as party or parties of the second part, hereinafter referred to as GRANTEE (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH, that the Grantor, for and in consideration of the sum of Ten Dollars and other valuable considerations ($10.00) Dollars in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledge, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto Grantee and Grantee's heirs and assigns, all the following described property, to wit:

ALL THAT TRACT OR PARCEL OF LAND lying and being in: For legal description see exhibit "A" attached hereto.

The purpose of this deed is to correct the legal description on the previous deed recorded at deed book U-18, page 491 wherein a scriveners error occurred. The correct caption in said exhibit "A" should have been stated as a 4873/5000, as opposed to 4873/600ths interest.

TO HAVE AND TO HOLD, the said bargained premises, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behoof of Grantee herein, Grantee's heirs and assigns, forever in Fee Simple.

AND THE SAID Grantor, for Grantor's heirs, executors and administrators, will warrant and forever defend the right and title to the above-described property unto the said Grantee, Grantee's heirs and assigns, against the claims of all persons whomsoever. "Grantor" and "Grantee" are used for singular or plural, as context requires.

IN WITNESS WHEREOF, the said Grantor has hereunto set Grantor's hand and seal, the day and year first above written.

Signed, sealed and delivered
in the presence of:

Witness

Tallulah River Company ,by its
President, Pat Jackson          (Seal)

118

A 4873/5000   undivided interest in and to:

All that tract or parcel of land lying and being in
Land Lot 9 of the Fifth Land District of Rabun
County, Georgia, being more fully described as follows:

BEGINNING at an iron pin located at the intersection
of the Easterly boundary line of U.S. Highway 441
with the Southerly bank of Tallulah River, said iron
pin being located at the Northernmost bridge on U.S.
Highway 441 crossing the Tallulah River. From said
beginning point thus established, run along and with
the top of the bank of Tallulah River the following
courses and distances:  North 52 degrees 52 minutes
East 356.1 feet to a point; thence along and with
the top of the bank of the river to a point located
North 14 degrees 37 minutes East 1,140.2 feet from
the last referenced point; thence North 10 degrees
03 minutes East 71 feet; thence North 13 degrees 27
minutes East 108.9 feet; thence North 35 degrees 32
minutes East 160.8 feet; thence North 55 degrees 45
minutes East 365.3 feet; thence South 80 degrees 12
minutes East 356.3 feet; thence South 59 degrees 56
minutes East 174.2 feet; thence South 20 degrees 06
minutes East 412.6 feet; thence South 11 degrees 42
minutes East 69.1 feet; thence South 02 degrees 44
minutes West 221.3 feet; thence North 81 degrees 28
minutes West 98.2 feet; thence South 26 degrees 20
minutes West 117.9 feet; thence South 11 degrees 17
minutes West 193.6 feet; thence South 08 degrees 31
minutes West 132.2 feet; thence South 09 degrees 57
minutes West 261.3 feet; thence South 05 degrees 47
minutes West 175 feet; thence South 21 degrees 40
minutes West 142.5 feet; thence South 04 degrees 09
minutes West 191.9 feet; thence South 30 degrees 48
minutes West 162.2 feet; thence South 37 degrees 19
minutes West 318.2 feet; thence South 33 degrees 13
minutes West 65.9 feet; thence South 46 degrees 34
minutes West 50.5 feet; thence along and with the bank
of said river to a point located South 44 degrees 10
minutes West 661.2 feet from the last referenced point;
thence North 80 degrees 25 minutes West 246 feet to a
point; thence North 86 degrees 00 minutes West 175.1
feet to an iron pin on the Northerly bank of the
Tallulah River, said iron pin being located on the
Easterly right of way of U. S. Highway 441; thence
North 02 degrees 07 minutes East 1,162.3 feet to
an iron pin and point and place of beginning containing
69.33 acres and being more fully described upon a plat
of survey prepared by William F. Holader, Georgia
Registered Land Surveyor No. 1042, dated January 28,
1983, and recorded in the office of the Clerk of Rabun
Superior Court in Plat Book 18, Page 231.

EXHIBIT  "A"

# EXHIBIT "C"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

282

After filing, please mail to Pat Jackson, P.O. Box 1886, Clarkesville, GA 30523
(706) 754-4999

STATE OF GEORGIA                    Cross Reference:

COUNTY OF RABUN                     Deed Book U-18
                                    Page 494

MODIFICATION AGREEMENT

For the purpose of confirming the same to the intention of the parties, and in consideration of TEN DOLLARS ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, it is agreed between the undersigned parties that the Deed to Secure Debt heretofore made by TALLULAH RIVER MOUNTAIN RESORT, INC. (GRANTOR), in favor of TALLULAH RIVER CO., INC (GRANTEE), of/to TALLULAH RIVER COMPANY dated April 4, 1999, said Deed to Secure Debt being recorded on May 24, 1999, in Deed Book U-18, page 494, records of Rabun County, Georgia shall be amended and modified as follows:

1.   The original Deed to Secure Debt and this Modification are made under the provisions of the existing Code of the State of Georgia to secure a debt and interest all that debt that is evidenced by a Promissory Note dated April 4, 1999 made by TALLULAH RIVER MOUNTAIN RESORT, INC. to the order of TALLULAH RIVER CO., INC. for the principal sum of $2,700,000.00. Except as herein set forth, said instruments shall remain unamended and in full force and effect.

2.   The terms of repayment shall be modified as follows:
        Balance at time of modification:    $2, 913,807.65
        Interest Rate:                       5.50%
        Next Payment Due:                    September 1, 2001
        Last Payment Due:                    July 1, 2004
        Payment Amount:                      $28,194.07 (monthly)

3.   The Grantor covenants that the Grantor is lawfully seized and possessed of the property and has a good right to convey it and that the property is unencumbered except to the collateral described in exhibit "A" attached to the dated to secure debt.  The Grantor shall and will WARRANT, AND FOREVER DEFEND the bargained property to the Grantt against the Grantor and against each and every other person or persons.
     If the Debt secured by this Modification is paid according to its tenor and effect of the Note when it becomes due and payable and if the Grantor performs all covenants

STATE OF GEORGIA
RABUN COUNTY
I, THE UNDERSIGNED, Clerk of the Superior Court,
Rabun County, Georgia, DO HEREBY CERTIFY that
within and foregoing is a true and correct copy of the
original as it appears on record and file in the Office
of the Clerk of Superior Court, Rabun County, Georgia
This ___ day of _____, 20__
Witness my hand and the Seal of Said Court.
This ___ day of _____, 20__
_____
Clerk Superior Court
Rabun County, Georgia

canceled and surrendered. The Grantor covenants and agrees that so long as the Debt secured by the Deed to Secure Debt remains unpaid, the Grantor will keep the Property and all improvements on the Property in as good a condition as now exists, natural wear and tear excepted. The Grantor will not demolish, destroy or remove any permanent structure or make any alterations on the Property that constitute a structural change without the written consent of the Grantee. The Grantor will pay all taxes and assessment that may be

liens on the Property as they become due. The Grantor will keep the Property fully insured against loss by fire, lightning, windstorm, and such other hazards as may be from time to time required by the Grantee, and with loss payable to the Grantee. The Grantor will deliver the policies of insurance and any renewals of those policies to the Grantee. Any lien, tax, assessment, prior lien or insurance premium on the property not paid when due by the Grantor may be paid by the Grantee. Any sum so paid by the Grantee shall be added to the amount of this principal under the Note, shall draw interest from the time of the payment at the rate of ten percent (10%) annually, and shall, with interest be covered by the security of the Deed to Secure Debt.

As further security for the Debt, the Grantor assigns, sets over, and transfers to the Grantee all leases pertaining to, and all rents that shall subsequently become due or be paid for, the use of the property, reserving only the right to the Grantor of collecting the rents so long as there is no default in the Grantor's performance of the obligations under this Deed or in payment of the Debt. In the event of any default in payment of all or any part of the Debt or in the performance of any obligations of the Grantor under the Deed to Secure Debt, the Grantee may enter on the Property and collect the rents of tab Property. The Grantee is constituted and appointed as the Grantor's agent and attorney-in-fact to collect the rents by any appropriate proceeding.

The title, interest, rights and powers granted to the Grantee, particularly the power of sale granted in the Deed to Secure Debt, shall inure to the benefit of anyone to whom the Grantee shall assign the Debt secured by the Deed to Secure Debt or shall convey the Property, or both, as well as to the successors and legal representatives of the Grantee.

And the Grantor further covenants that in case of a sale as provided in the security deed, the Grantor, or any person in possession under the Grantor, shall then become said, shall be tenants holding over and shall immediately deliver possession to the purchaser at the sale or shall be summarily dispossessed, in accordance with the provisions of law applicable to tenants holding over.

The power and agency granted under the Deed to Secure Debt are coupled with an interest, are irrevocable by each or otherwise, and are granted as cumulative to the remedies for collection of the Debt that are provided by law.

This Deed to Secure Debt and any evidence of indebtedness secured by the security deed shall be deemed and construed to be contracts that were executed and that are to be performed in Georgia.

4. The County for exercising the right of foreclosure shall b Rabun County Georgia, and the correct interest in said real property is 37.5/0.000.

WITNESS the hands and seals of the undersigned parties, this  4 day of  Aug, 2001

284

TALLULAH RIVER MOUNTAIN RESORT, INC.

_____
Myron Smith, President

Witness _____

Notary Public
" NOTARY SEAL *

_____
Myron Smith, Guarantor

_____
Cecilia Smith, Guarantor

TALLULAH RIVER CO., INC.

Witness _____

Notary Public
" NOTARY SEAL *

Witness _____

Notary Public
" NOTARY SEAL *

RECORDED THIS THE 14TH DAY OF DECEMBER, 2001, _____ CLERK, S.C.

# EXHIBIT "D"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

STATE OF GEORGIA
RABUN COUNTY
I, THE UNDERSIGNED, Clerk of the Superior Court,
Rabun County, Georgia, DO HEREBY CERTIFY that the
within and foregoing is a true and correct copy of the
original as it appears on record and file in the Office
of the Clerk of Superior Court, Rabun County, Georgia
Witness my hand and seal this ___ day of ___ 20 14
_____
Clark Superior Court Rabun County, Georgia

After filing, please mail to Tallulah River Mountain Resort, P. O. Box 129, Tallulah Falls, GA  30573

# TALLULAH RIVER MOUNTAIN RESORT
## WARRANTY DEED

STATE OF GEORGIA
COUNTY OF RABUN

THIS WARRANTY DEED, made this ___5___ day of __DECEMBER__, _2003_,
between TALLULAH RIVER MOUNTAIN RESORT, and _____
_____ROBERT A. THOMSEN _____
(hereinafter referred to as "Grantee") (the words "Grantor" to include their respective
heirs, successors, and assigns where the context requires or permits.)

WITNESSETH that: Grantor, for and in consideration of the sum of One Dollar
($1.00) and other good and valuable consideration in hand paid at and before the
sealing and delivering of these presents, the receipt whereof is hereby acknowledged,
has granted, bargained, sold, aliened, conveyed, and confirmed, and by these presents
does grant, bargain, sell, alien, convey, and confirm unto Grantee a one-five thousandth
(1/5000th) undivided interest in all that tract or parcel of land located in Rabun County,
Georgia, known as TALLULAH RIVER MOUNTAIN RESORT, and being more particularly
described as that certain tract or parcel of land described on that certain plat of survey
prepared by William F. Rolader, Georgia Registered Land Surveyor No. 2042, dated
January 28, 1983, and recorded in the Office of the Clerk of Rabun County, Georgia
Superior Court in Plat Book 18, page 231.

This conveyance is made subject to that certain Declaration of Restrictions for
said real estates dated SEPTEMBER 20, 1999, recorded in Deed Book D-9, pages 344 - 377, and
agreement of Conservancy recorded in Deed Book D-9, pages 618-620, aforesaid records
and public utility and right-of-way easements of records and those in use.

For purposes of indentification only, the undivided interests conveyed hereby are Units
No. _D3000-D3899 (representing 1000 UDI in total)_____

TO HAVE AND TO HOLD the above-described property, with all and singular the
rights, members, and appurtenances thereof, to the same being, belonging, and in anywise
appertaining, to the only proper use, benefit, and behoof of Grantee forever in FEE SIMPLE.
Grantor will warrant and forever defend the right and title to the above-described
property, except as to those matters set forth above, unto Grantee against the claims of all
persons whomsoever.
IN WITNESS WHEREOF, Grantor has executed this Deed under seal the day and
year first above written.

Signed, sealed, and delivered in the                 TALLULAH RIVER MOUNTAIN RESORT
presence of :                                        A Georgia Corporation

_____                             _____
Notary Public, State of Georgia                      Attest
MY COMMISSION                                                        RABUN COUNTY, GEORGIA
EXPIRES 5/20/07                                                      FILED ... FOR ...
                                RABUN _____ County, Georgia
_____          Real Estate Transfer Tax       '79 DEC 31  PM II: 30
Witness                          Paid $ __100.00__
                                 Date __DECEMBER 31, 2003__
                                          _____
* NOTARY SEAL *                           Clerk of Superior Court

RECORDED THIS THE 31ST DAY OF DECEMBER 2003  _____  CLERK, S.C.

155

156

## MANAGEMENT AGREEMENT

WHEREAS Tallulah River Mountain Resort, Inc. (TRMR) owns and operates a membership campground consisting of approximately 70 acres located in Rabun County, Georgia; along with all improvements including approximately 160 RV/camp sites, 7 rental cabins, 5 lodges, and 3 mobile rental units and

WHEREAS Professional Property Management (PPM) has extensive experience in the development and management of campground resort properties and

WHEREAS TRMR is desirous of retaining a professional property management group to over see any and all aspects of their property located in Rabun County, Georgia; known as Tallulah River Mountain Resort. Said management responsibilities shall include all member relations activities, security, building(s) maintenance, pool(s) maintenance, restaurant operations and maintenance, campsite maintenance, road maintenance, property water system maintenance, sewage and septic system maintenance, housekeeping, payables, receivables, vending services, entertainment, park host, property personnel, reservations, check-in/check-outs, landscape maintenance, member dues collections, members assessments and dues billing and members newsletters, rental units décor and upkeep, furniture upkeep, office fixtures, computer systems/programs, internet systems/programs, phone systems and

WHEREAS TRMR and PPM have jointly arrived at an annual operational budget which both parties agree is reasonable for the nature of this property and based on this budget PPM agrees to accept $530,000.00 in annual dues plus approximately $40,000.00 in additional rental fees as compensation for the above and

WHEREAS TRMR and PPM realize that there is approximately $160,000.00 in deferred maintenance on the property to include:

| | |
|---|---|
| 1.) | New roof system for clubhouse |
| 2.) | Indoor pool to be re-surfaced/painted, indoor/outdoor carpet removed and deck tile |
| 3.) | Indoor pool bathrooms to be remodeled |
| 4.) | Exterior of clubhouse to remodeled, including front stairs |
| 5.) | Outdoor pool to be reworked, including new liner |
| 6.) | Restaurant to be expanded and remodeled |
| 7.) | Shower house "A" to be remodeled |
| 8.) | Renovate 4 lodges |
| 9.) | Renovate 7 cabins and |

WHEREAS TRMR has collected approximately $280,000.00 of the $480,000.00 2004 dues. These dues being fully spent to date by TRMR, leaving an anticipated $190,000.00 operational shortfall in addition to the $160,000.00 in deferred maintenance, resulting in a total deficiency of approximately $350,000.00.

NOW THEREFORE TRMR agrees that said property management agreement shall be perpetual in nature and irrevocable except for cause. That PPM will be authorized to make a one time special assessment to the current membership in the amount of $125.00 per member to address the severe deferred maintenance items. Additionally TRMR pledges the anticipated $65,000.00 DOT monies to go to PPM for improvements to the resort. TRMR agrees that if necessary PPM can postpone the internal $5000.00 per month maintenance impound deposit until start of budget year 2005, which begins in September 2004.

NOW THEREFORE TRMR transfers, conveys all equipment currently used in the operation of the property to include: (1) golf cart, (2) pickup trucks, cherry picker, lawn maintenance equipment, office furniture/equipment, office machines, phone systems, computer systems, pool maintenance equipment, tools, restaurant equipment, cabin furniture, lodge furniture, pool furniture, restaurant furniture and all personal property what so ever currently located on property and being used for same.

Both TRMR and PPM acknowledge that as future sales of memberships precede that theoretically the annual dues collected by PPM should most certainly exceed $530,000.00 per budget year.  In this event all dues collected in excess of $530,000.00 per budget year by PPM shall be treated as follows:

1.) 48% of said excess goes to PPM to cover increased demands placed on the property by additional memberships.
2.) TRMR will receive 26% of said excess.
3.) PPM will retain 26% of said excess as increased profit.

PPM acknowledges TRMR right to expect certain minimum property standards and professional treatment of the property members.  In the event that TRMR feels that the standards are inadequate TRMR shall give written notice to PPM of said deficiencies and sub-standard performance.  This written notice shall be delivered to the general office of PPM at 32 Resort Drive, Tallulah Falls, Georgia 30573.  PPM shall have 15 days to respond to any such notice and an additional 30 days to correct agreed upon deficiencies.  If said deficiencies are of such a nature that would require major construction, this time limit is extended appropriately.  If in the event TRMR and PPM fail to agree and or resolve any differences with regard to these deficiencies both parties will agree to enter into binding arbitration.  TRMR acknowledges the considerable capital and manpower investment to be made in bringing this property up to standards.  TRMR in asking PPM to undertake this effort forever assigns its rights to assess and collect dues at The Tallulah River Mountain Resort to PPM and hereby agrees to defend PPM rights under this contract.

TRMR acknowledges that it would be virtually impossible for PPM to fully understand the nature of the current electric, gas, water, sewer and road systems and in arriving at a reasonable budget to address the operation and maintenance of these systems PPM has made assumptions that would be deemed reasonable in the event that a unforeseen system failure of catastrophic nature where to occur, PPM will be responsible for undertaking said repair or replacement, but jointly TRMR and PPM would have to arrive at an alternative funding solution.  In addition any acts of God that might effect the operation and usability of this property are by definition beyond the control of PPM.  PPM will use its best efforts in these events to minimize damage to the property and to bring the property back up to standard.

TRMR acknowledges it would be impossible to place a monetary value on this contract and therefore in asking PPM to undertake said contract agrees that it shall forever indemnify and defend PPM's right to this contract except for non-performance on PPMs part.

All parties agree that this said Agreement may be forwarded for review to their respective tax and legal advisors and that any adjustments in language or form which will not adversely affect either party or the intent of this Agreement will thereby agreed to.

Myron Smith
TRMR, Inc.
President

Steve Thomsen
PPM
Owner

This 5th day of December, 2003

This 5th day of December, 2003

_____        _____
Witness                                     Witness

RECORDED THIS THE 31ST DAY OF DECEMBER 2003 _____  CLERK, S.C.

157

# EXHIBIT "E"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

IN THE SUPERIOR COURT OF HABERSHAM COUNTY

STATE OF GEORGIA

TALLULAH RIVER MOUNTAIN          :
RESORT, INC.,                    :
                                 :
          Plaintiff,             :     CIVIL ACTION
                                 :
v.                               :     FILE NO.:   04-CV-130C
                                 :
TALLULAH RIVER COMPANY, INC.,    :
and PATRICIA JACKSON             :
                                 :
          Defendants.            :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                              August 11, 2004
                              Stephens County Courthouse

     BEFORE:   HONORABLE JAMES E. CORNWELL, JR.
               Superior Court Judge, Mountain Circuit
               P.O. Box 758
               Toccoa, Georgia  30577

     APPEARANCES:

                    On behalf of the Plaintiffs:
                    Mr. Louis Cohan
                    Weinstock & Scavo
                    3405 Piedmont Rd., N.E., Suite 300
                    Atlanta, Georiga  30305

                    On behalf of Defendants:
                    Mr. William R. Oliver
                    P.O. Box 1226
                    Cornelia, Georgia  30531

                    Mr. Ernest V. Harris
                    Harris & Liken
                    P.O. Box 1586
                    Athens, Georgia  30603

COPY

Reported by:
Anita W. Moore, C.C.R.
Rt. 1, Box 494E
Eastanollee, Georgia  30577
706-779-2295

```
 1                    P R O C E E D I N G

 2          THE COURT:  This is in the Superior Court of

 3      Habersham County, Tallulah River Mountain Resort, Inc.,

 4      Plaintiff versus Tallulah River Company, Inc., and

 5      Patricia Jackson, Defendants.

 6          Appearances first please for the Plaintiff?

 7          MR. COHAN:  Louis Cohen, Judge, for the Plaintiff.

 8          THE COURT:  And for the Defendants?

 9          MR. OLIVER:  William Oliver.

10          MR. HARRIS:  Bernie Harris.

11          THE COURT:  All right, gentlemen, it's 4:10 and

12      you've been conferencing since 1 o'clock and I understand

13      that you have reached a settlement as to all issues

14      involving these parties, is that correct?

15          MR. HARRIS:  That's correct.

16          MR. COHAN:  That sounds correct, Your Honor.

17          THE COURT:  And is that your understanding Ms.

18  Jackson?

19          DEFENDANT JACKSON:  Right.

20          THE COURT:  And Mr. Smith, is that your

21  understanding?

22          PLAINTIFF SMITH:  Yes, Your Honor.

23          THE COURT:  And the other gentleman is Mr.--

24          MR. COHAN:  Thomsen.

25          THE COURT:  Thomsen.  I'm looking for Mr. Thomsen.
```

```
 1         MR. COHAN:  I think he stepped out to take a call
 2    from his wife to confirm that he can agree, Judge.
 3         THE COURT:  Does he have the authority to agree?
 4         MR. COHAN:  He's confirming that authority right now.
 5         THE COURT:  Do you want us to wait for him to return
 6    before we start putting this agreement on the record?
 7         MR. HARRIS:  He's a mutual party, Your Honor, in
 8    regards to the suit that we would actually have a hearing
 9    on today and I would request we wait until he get her.
10         THE COURT:  Mr. Smith, are you going to look for him?
11         DEFENDANT SMITH:  I was going to bring him in, sir
12         THE COURT:  Please do.  Please bring him in.  If he
13    needed authority from his wife she should have been here
14    during the negotiations.
15         All right, Mr. Thomsen, good afternoon, sir.
16         DEFENDANT THOMSEN:  Good afternoon, Judge.
17         THE COURT:  Do you understand that this case has been
18    settled.
19         DEFENDANT THOMSEN:  Yes, sir.
20         THE COURT:  All right, we're going to ask one of the
21    attorneys to tell me what the terms of settlement are and
22    I would ask all concerned to listen very closely because
23    when we finish I'm going to ask if you understand the
24    terms of settlement and if you agree to those terms, and
25    if you have any questions concerning those terms.  I don't
```

1       want to be revisiting this case in three months or six

2       months or twelve months or forever, and I don't think you

3       do either.  Who is going to give it a shot?

4               MR. HARRIS:  I think I will, Your Honor.

5               THE COURT:  Mr. Harris.

6               MR. HARRIS:  What I would like to do, Your Honor is

7       read into the record the Settlement and Release Agreement

8       that actually was prepared yesterday.  It's been

9       significantly revised today, and I think I have all the

10      terms now.

11              The parties to this agreement are Tallulah River

12      Mountain Resort, Incorporated, which is the entity that

13      personally owns the Tallulah River Resort outside of

14      Tallulah Falls, and that is principally owned by Myron

15      Smith.  Mr. Smith, Myron Smith is also -- and from this

16      point forward Tallulah River Mountain Resort, Inc., will

17      be referred to as TRMR.  Myron Smith is a party to the

18      agreement, referred to as Myron.

19              Tallulah River Company, Inc., which will be known as

20      TRC, that is the corporation owned by Patricia Jackson.

21      Then Patricia and Randy Jackson, which will be referred to

22      jointly as The Jacksons.  Also, the Thomsen's, Bill and

23      Sheila, excuse me, Robert and Sheila Thomsen will also be

24      part of this agreement.

25              MR. COHAN:  Judge, it's Robert A. Thomsen, T-H-O-M-S-

4

1      E-N, no P, and Sheila, S-H-E-I-L-A.

2          MR. HARRIS:  Also party to the agreement is an entity

3      known as TRM Development, LLC, which I think is owned or

4      controlled by the Thomsens.

5          THE COURT:  What about Professional Property

6      Management?

7          MR. COHAN:  They are not a party to this agreement.

8      They don't own any ownership interest in any of the

9      property that's the subject of the agreement.

10         MR. OLIVER:  They are basically a management company,

11     not incorporated, a management company that was hired by

12     Mr. Smith's corporation, TRMR.

13         MR. COHAN:  It is incorporated.

14         THE COURT:  But they're not a party to this

15     agreement?

16         MR. OLIVER:  No, sir.

17         THE COURT:  Mr. Harris, continue on.

18         MR. HARRIS:  Those parties enter into this settlement

19     and release agreement this 11th day of August, 2004, as

20     follows:

21         Whereas, TRMR owns that certain property known as the

22     Tallulah River Mountain Resort located in Rabun County,

23     Georgia consisting of approximately 69.33 acres, less and

24     except the undivided interest, or UDI's, previously sold,

25     transferred, conveyed and pledged, and any portion

1    previously condemned by the State of Georgia, as well as

2    the improvements thereon and the business operated

3    thereon, hereinafter referred to as The Resort.

4        Whereas, TRC has a deed to secure debt on the resort

5    securing a debt in the approximate amount of $2,400,000,

6    which is referred to as TRC's security deed, as evidence

7    by a promissory note in the face amount of $2,513,067 owed

8    by TRMR to TRC and guaranteed by Myron Smith.

9        MR. COHAN:  Judge, the only point about that is the

10    security deed is, um, it's not on the resort as defined in

11    the agreement.  It's on certain real estate as was

12    previously defined.  It does not include any business --

13    anything other than real estate.

14        MR. HARRIS:  Whereas, TRMR filed Civil Action we're

15    here on now, Civil Action 04-CV-130C in the Superior Court

16    of Habersham County, Georgia against TRC and Patricia

17    Jackson alleging breach of warrant and breach of contract

18    and for other damages; and

19        Whereas, TRC and Patricia Jackson filed an Answer and

20    Counterclaim denying liability and seeking damages against

21    TRMR.

22        Whereas, there is currently pending a condemnation

23    action by the Georgia Department of Transportation against

24    a portion of the resort property fronting U.S. 441,

25    hereinafter referred to as the DOT action.

1          Whereas, TRC holds by assignment certain commercial
2     paper and notes owed to TRMR by members of the resort
3     holding an undivided interest in the resort.
4          Whereas, a dispute exists between the parties as to
5     the number of undivided interests, known as UDI's, that
6     are owned by TRMR, that have been sold, that are valid
7     claims against the resort, that actually own an interest
8     in the resort, that remain for sale, that constitute a
9     security interest pursuant to TRC's security deed and as
10    to the proper way to describe the UDI's on a warranty deed
11    and security deed.
12         Whereas, TRC and/or the Jacksons owe Judee Haas
13    and/or Blakesland, LLP a debt, known as the Haas debt; and
14         Whereas, TRMR currently has no insurance coverage on
15    the resort, that we're aware of, and owes back ad valorem
16    taxes to Rabun County on the resort.
17         MR. COHAN:  Judge, actually, the fact is there is
18    insurance on the resort, um, so that particular recital
19    wasn't accurate.  I don't know that that goes to the
20    substance of the agreement.
21         MR. HARRIS:  When we prepared this we were unaware of
22    that.  They tell us now that there is.
23         Whereas, the old promissory note matured as of July
24    1, 2004 and is now due and payable in full.
25         Whereas, there is a -- Myron owes the Jacksons

1    approximately $96,000 on eight lots located in Greene

2    County, Georgia.

3        MR. COHAN:  It was 19,000.

4        MR. HARRIS:  We did away with the 19.

5        MR. COHAN:  We still have to talk about it to talk

6    about doing away with it.

7        MR. HARRIS:  Well, he owes approximately 19,000 and

8    also 96,000 on eight lots, owes the value of eight lots

9    located in Greene County that the Jackson's transferred to

10    Myron in years past.

11        Whereas, all of the parties to this Agreement,

12    desiring to settle all claims each has against the other

13    and resolve all disputes; it is agreed that for and in

14    consideration of the following covenants, the parties will

15    perform as follows:

16        TRMR will pay TRC $56,388.14 not later than August

17    12, 2004, which will be applied against the amount due

18    under the old promissory note reducing the balance owed to

19    approximately $2,300,000.00.

20        MR. COHAN:  Not approximate.  It is $2,300,000.00.

21        MR. HARRIS:  Okay, $2,300,000.00.

22        Upon receipt of said payment and execution of this

23    Agreement by TRMR and the other parties, TRC will

24    immediately stop the foreclosure proceeding currently

25    being published in the Clayton Tribune.

1            Two, TRMR will execute a new promissory note that

2       replaces the old promissory note payable to TRC in the

3       face amount of $2,300,000,00 plus any interest that will

4       accrue from this date through the end of August, date

5       effective -- well -- with the first payment due on October

6       1, 2004--

7            MR. COHAN:  That wasn't what we settled on.  What we

8       settled on was a 2.3 million dollar note that's going to

9       have the first payment due on October 1st.  Right?

10           MR. HARRIS:  Right.

11           MR. COHAN:  Okay.

12           MR. HARRIS:  There is some interest so we make the

13      note--

14           THE COURT:  Is there interim interest between today's

15      date and October 1?

16           MR. HARRIS:  Yes, interim interest from here until

17      the end of this month because the first payment is going

18      to be due almost two months in the future.  We did agree

19      to that, Mr. Cohan.

20           THE COURT:  So you agreed on interest between

21      tomorrow's date and the end of August.

22           MR. HARRIS:  End of August, whatever that is will be

23      added to the face amount of the note.

24           MR. COHAN:  Eighteen days of interest on 2.3 million

25      dollars.

1          THE COURT:  That's my understanding.  I'm seeing

2     heads nodding.

3          MR. HARRIS:  The first payment being due October 1

4     payable over twenty years, 240 monthly payments, at the

5     rate of 7% per annum.  The new promissory note will not

6     contain a prepayment penalty.  All payments will be by

7     cash or check, no paper accepted, and due on the 1st of

8     each month with a 2 1/2% late charge on the amount of any

9     late payment that is made after the 10th day of the month,

10    providing that if any payment is not received by the 10th

11    day of the month, the note will be in default.

12         We are preparing a separate promissory note that will

13    have all these terms in it.

14         MR. COHAN:  I assume there is going to be a no

15    prepayment provision.

16         MR. HARRIS:  I said that.

17         Three, the new promissory note will be guaranteed by

18    Myron Smith.

19         Four, the new promissory note replaces the old

20    promissory note which will be cancelled by TRC within five

21    business days of execution of the new promissory note.

22         Five, the new promissory note will be secured by The

23    Resort and TRMR will execute the modified security deed

24    granting TRC a valid first lien upon recording on The

25    Resort.

                            10

1          MR. COHAN:  To the extent The Resort was defined and
2     determined above, Judge, and it's over broad.  The
3     security from the note is the real estate and the UDI's,
4     and then there's the UCC's that we're going to talk about
5     later.

6          MR. HARRIS:  Well, it will be a modified security
7     deed on record that is secured by a legal description of
8     real estate.

9          MR. COHAN:  Not--

10         THE COURT:  Not the business, understood.

11         MR. HARRIS:  Six, TRMR will pay all outstanding ad
12    valorem taxes owed Rabun County on The Resort through the
13    year 2003 no later than December 31, 2004 or at a later
14    date if TRMR is able to make suitable arrangements with
15    the Rabun County for an extension of that.

16         THE COURT:  But there's no drop dead date?  No later
17    than?

18         MR. HARRIS:  They have to make the agreement by the
19    end of the year -- have to pay it or have an agreement in
20    place by the end of -- December 31, 2004.

21         I think we still have the next in.  Seven, the
22    existing TRC security deed is agreed by all parties to the
23    best of their knowledge to be a first lien on the
24    described real estate and it presently secures the old
25    promissory and will secure the new promissory note.

11

```
 1          Number eight, TRMR will assume -- excuse me, Your
 2      Honor.
 3          Let's make that part of number seven then, TRC is
 4      entitled to advance payment of any taxes and/or insurance
 5      if necessary and apply that to the principle amount of the
 6      note to be paid.
 7          MR. COHAN:  If necessary to protect its security
 8      interest.
 9          MR. HARRIS:  If necessary to protect the security
10      interest.
11          MR. OLIVER:  It's an option, not a requirement.
12          MR. HARRIS:  Number eight, TRMR will assume the Haas
13      debt and indemnify and hold harmless TRC and the Jacksons
14      from any and all claims that arise or could arise pursuant
15      to the Haas debt.  TRMR will notify Judy Haas of this
16      assumption and take whatever reasonable action necessary
17      to have TRC and the Jacksons released from the Haas debt.
18          MR. COHAN:  To take reasonable action.
19          MR. HARRIS:  I said reasonable.
20          THE COURT:  That was added to the proposed agreement.
21          MR. HARRIS:  Number nine, TRMR will obtain property
22      damage insurance adequately insuring all of the real and
23      personal property at The Resort within ten days of the
24      execution of this Agreement.  The insurance policy will
25      name TRC as loss payee and provide that TRC will be
```

1    notified in the event of cancellation of the policy.
2    Cancellation of the policy will constitute a default under
3    the new promissory note and TRC's security deed.

4         It is our understanding that they do now have
5    insurance, so if they have insurance that provision has
6    been fulfilled, as long as it meets the other requirements
7    therein.

8         Ten, to secure the new promissory note TRMR will
9    grant to TRC a first security interest in all of the
10   personal property located at The Resort, which will be
11   evidenced by a UCC-1 financing statement filed in the
12   Office of the Clerk of Superior Court in Rabun County,
13   Georgia. That will end that and then we'll have another
14   provision I'll come back to in a minute.

15        Number eleven, Myron Smith will execute a promissory
16   note to the Jacksons in the face amount of $96,000 secured
17   by the eight lots at 8% interest payable in equal monthly
18   installments over ten years, with the first payment not
19   later than October 1, 2004 or the date the warranty deed
20   on the eight lots is recorded. The Jacksons will cause to
21   be provided a warranty deed conveying the eight lots if
22   not produced provided within ten days of execution of this
23   agreement.

24        THE COURT: So that's the $96,000.
25        MR. HARRIS: That's the 96.

13

```
 1              THE COURT:  Is there an additional 19 we were going

 2         to talk about?

 3              MR. HARRIS:  There was a $19,000 note that -- it has

 4         been agreed, and I'm afraid -- I'll let Mr. Cohan describe

 5         that.

 6              MR. COHAN:  Yeah, I think the best way to handle

 7         that, Judge, there was an additional amount, I think it

 8         was originally $25,000.  There was a $6,000 payment

 9         somewhere along the way.  The parties have agreed the

10         balance is $19,000 and in return for Mr. Smith's

11         assumption of the Haas debt Mr. Jackson has agreed to

12         release Mr. Smith from any obligation to pay that debt.  I

13         think that's going to be covered later down in the release

14         language, but we'll add some language and clearly not be

15         not limited to that debt specifically.

16              MR. HARRIS:  Number twelve, TRC will retain all of

17         the TRMR paper it now holds and will have no recourse

18         against TRMR or the Smiths, Myron Smith, if any of the

19         TRMR paper becomes past due or uncollectible, TRC will

20         assume full responsible for collecting the TRMR paper.

21              Thirteen, TRC and the Jacksons give up any and all

22         claims to the DOT action and any condemnation proceeds

23         paid pursuant to the DOT action.

24              Fourteen, TRMR, TRC and Patricia Jackson will jointly

25         dismiss aforementioned Civil Action 04-CV-130C with
```

                                    14

1    prejudice which extinguishes all claims asserted or that

2    could be asserted by the parties in that suit.

3         Fifteen, TRMR, TRC, Myron Smith and the Jacksons all

4    release any and all claims each has, may have or could

5    have against any or all of the other parties to this

6    Agreement, known and unknown, from the beginning of time

7    through the date of this Agreement other than the

8    obligations specifically set forth herein and as set forth

9    in the promissory notes, security deeds, security

10   agreements and financing statements specifically

11   contemplated in this Agreement.

12        This includes the aforementioned $19,000 which will

13   be released by the assumption of the Haas debt.  Also this

14   includes, but is not limited to, any claim of TRMR or

15   Myron Smith regarding the undivided interest originally

16   transferred by warranty deed from TRC to TRMR.  Basically

17   everything -- it's going to be released -- everything they

18   have against the other is being released other than those

19   things specifically set forth in this Agreement.

20        Number sixteen --

21        Let me add one other thing because the Thomsens -- it

22   wasn't part of my original agreement and I'll make this I

23   think paragraph sixteen.

24        Robert and Sheila Thomsen and/or any entity under

25   their control will convey, transfer and convey, 700

15

1       undivided interests back to TRMR.  And the Thomsens and

2       any entity under their control such as TRM Development,

3       LLC will cancel the UCC-1 on record, which is in favor of

4       TRM Development, LLC securing the personal property assets

5       of TRMR and/or Tallulah River Resort.  There is a UCC-1 on

6       record and it will be cancelled.

7       TRC will quitclaim, TRC, Tallulah River Company will

8       quitclaim any interest it has or may have in the 300 UDI's

9       that will still be owned by the Thomsens or any of their

10      entities in the future.

11      MR. COHAN:  Let me just make the record a little more

12      clear on that, Judge.  There are 1,000 UDI's that were

13      transferred to the Thomsens.  They are going to re-convey

14      700 of them back as Mr. Harris has described.  They are

15      going to keep 300 of them.  The 300 that they are going to

16      keep are going to be released by quitclaim deed from TRC

17      and/or the Jacksons so that those 300 UDI interests will

18      not be subject to the security deed for this 2.3 million

19      dollar loan that we're talking about.

20      THE COURT:  I understand that.

21      MR. HARRIS:  Number seventeen, all parties will

22      execute this Agreement, but it becomes effective upon the

23      execution by the designated representative for TRMR, the

24      designated representative for TRC, Myron Smith, the

25      Jacksons and Robert Thomsen on behalf of himself and

16

1    Sheila and any entities under the control by Robert and
2    Sheila Thomsen.  Each party will be furnished an original,
3    with a faxed or e-mailed copy constituting an original.
4    It is not necessary that all parties sign one document as
5    multiple signature pages will be furnished and each signed
6    signature page will part of the same agreement.
7         COURT REPORTER:  I'm sorry, Mr. Harris, you're going
8    to have to slow down just a little, you're reading.
9         MR. HARRIS:  I get to the boiler plate language and
10   it starts being too fast, and I apologize.
11        This is number seventeen.  All parties will execute
12   this Agreement, but it becomes effective upon the
13   execution by the designated representative for TRMR, the
14   designated representative for TRC, Myron Smith, the
15   Jacksons and Robert and Sheila Thomsen on behalf of
16   themselves and any entities they have a controlling
17   interest in.
18        MR. COHAN:  Judge, if noone has any objection, my
19   strong preference would be that we make this agreement
20   effective today.
21        THE COURT:  Well, that's my thought.  We're on the
22   record, we've got the parties here, it'll be effective
23   whenever they say yes, this is the agreement.  I mean,
24   there's consideration, we've got everything we need right
25   now.  I'm not going to wait and let this document pass

17

1       from hand to hand and if people have second thoughts and

2       there be any confusion about when this is effective.  I

3       mean, we've got a payment of, what, $56,000 that's going

4       to be made tomorrow?

5            MR. HARRIS:  Correct.

6            THE COURT:  So it's going to be effective today.

7            MR. COHAN:  Correct.

8            MR. HARRIS:  I was reading what I had written

9       yesterday, but this will be effective upon the end of my

10      recitation of this.  All parties speaking on the record

11      that they understand this and that they agree to this and

12      they're bound by this.

13           Eighteen, there will be no modification or amendment

14      of this Agreement except in writing and signed by all

15      parties.

16           Nineteen, this constitutes the entire agreement of

17      the parties.

18           Twenty, all parties agree that sufficient

19      consideration ha been given by each party to the other and

20      that this Agreement binds and obligates all parties to the

21      express terms set forth herein.

22           And paragraph, time is of the essence as to all

23      provisions of this agreement, whereas all the parties will

24      now -- once we have agreed this is the agreement all the

25      parties will announce that they do accept this.

```
 1          MR. COHAN:  As I understood there were a couple of
 2      more issues that were agreed between Mr. Thomsen and Ms.
 3      Jackson with respect to the 300 deeds.  Let me speak them
 4      out loud and make sure everybody's on he same page with
 5      that.
 6          As to the 300 deeds, um, that the Thomsens are going
 7      to keep, it is my understanding that everybody agrees they
 8      will never have to pay dues on those deeds and that they
 9      will have no voting rights on those deeds.  Is that right?
10          PLAINTIFF THOMSEN:  The dues will (inaudible)
11      transfer to a third party.
12          THE COURT:  Right, that makes sense.  Once he sells
13      those then the dues kick back in.
14          MR. COHAN:  So long as you own those you have no use
15      rights, no voting rights, (inaudible).  Myron, you're okay
16      with that?
17          PLAINTIFF SMITH:  Yes.
18          MR. COHAN:  Ms. Jackson?
19          DEFENDANT JACKSON:  Yes.
20          MR. OLIVER:  Those deeds are in Robert Thomsen's name
21      and he owns them individually.
22          MR. COHAN:  Correct.
23          THE COURT:  Any other entity.
24          MR. OLIVER:  And we didn't talk about this, but just
25      to be clear, no one will make a claim that we're releasing
```

19

1      the deeds, specifically the 300 deeds, will have any

2      effect on the security instrument to be signed by Mr.

3      Smith and TRMR to the Jacksons.

4            MR. COHAN:  No effect other than that specific--

5            MR. OLIVER:  Other than -- yes.

6            THE COURT:  Right, other than he owns those 300.

7            MR. HARRIS:  I believe that completes the agreement

8      if Ms. Court Reporter has that down.

9            MR. COHAN:  And one more thing that we did not talk

10     about, and I do think it does make good sense, and that is

11     a mutual non-disparaging provision; that is all the

12     parties will agree that they would not disparage the

13     others in any manner, um, from this day forward.

14            THE COURT:  First Amendment waiver.

15            MR. COHAN:  Exactly.

16            MR. OLIVER:  First Amendment waiver.

17            MR. COHAN:  Our concern -- let me speak our concern

18     so we make a record of it.  You see a bunch of people in

19     the courtroom and some of these people here are for us and

20     some of these people here are against us.  But there has

21     been a lot of communication about what's gone on at the

22     resort and who's the good guy and who's the bad guy and

23     what Myron did and what Thomsen did and what the Jacksons

24     did, and we want to put an end to all that.

25            THE COURT:  I don't want to hear a lot of contempt

1        cases on disparaging comments, though.  I don't want

2        someone coming in before me and saying, you know, he was

3        critical of me in some fashion.

4              MR. COHAN:  Wouldn't be a contempt, but it might be

5        a breach of contract claim or a defamation claim because

6        the problem is--

7              THE COURT:  I don't want to hear that either.

8              MR. COHAN:  Well, I understand, but our concern,

9        Judge, frankly, is that we do this deal, we transfer

10       $56,000 in hard money and the Jacksons then wage a

11       campaign that results in my clients being unable to sell.

12             THE COURT:  That would be counterproductive because

13       they're on the receiving end of a two million-three note.

14             MR. COHAN:  It's counterproductive only if you assume

15       they want the payments.  If you assume they want the

16       property back it's very productive.

17             THE COURT:  Well, if they wanted the property back I

18       think they would be pursuing this lawsuit in something

19       other than an agreement today.  Am I wrong, Mr. and Mrs.

20       Jackson?

21             MR. COHAN:  Possibly, Judge, except that they've got

22       problems, honestly, with the foreclosure and the lawsuit.

23       They have concerns about the UCC that's outstanding.

24             THE COURT:  Well, how do y'all feel about this non-

25       disparaging issue?

                                 21

1          THE COURT:  Mr. Smith, do you understand the

2      agreement as recited by the attorneys?

3          PLAINTIFF SMITH:  Yes, I do.

4          THE COURT:  Do you have any questions concerning

5      that?

6          PLAINTIFF SMITH:  I think it's all clear.

7          THE COURT:  Is that the agreement you made?

8          PLAINTIFF SMITH:  Yes, it is.

9          THE COURT:  And you're willing to be bound by that

10      from here ever after?

11          PLAINTIFF SMITH:  Yes, I am.

12          THE COURT:  Mrs. Jackson, same question to you, do

13      you understand the agreement?

14          DEFENDANT JACKSON:  Yes, sir.

15          THE COURT:  Do you have any questions of any type?

16          DEFENDANT JACKSON:  No, sir.

17          THE COURT:  And are you willing to be bound to that

18      agreement from here to the end of time?

19          DEFENDANT JACKSON:  Yes, sir.

20          THE COURT:  And Mr. Jackson, I don't know that you're

21      a party to it, but you have a signature line on this other

22      proposed agreement.  Any questions by you, sir?

23          MR. JACKSON:  No, sir.

24          THE COURT:  Are you willing to be bound by it?

25          MR. JACKSON:  Yes, sir.

# EXHIBIT "F"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

Book 522 Page 436

☐ ORIGINAL

STATE OF GEORGIA
COUNTY OF RABUN

## AFFIDAVIT OF OWNERSHIP

BEFORE ME came in person, **Myron Smith** and **Tallulah River Mountain Resort, Inc., a Georgia Corporation** hereinafter variously referred to as "Affiants or Owners", who, having been duly sworn and on oath, deposes and says as follows:

1. That the Affiants hold interest of the fee simple Estate in and to the improved real property (hereinafter referred to as the "Property") located in Rabun County, Georgia, more particularly described as following:

See Exhibit 'A'

2. That except as set forth below, there are no unpaid or unsatisfied security deeds, mortgages, claims of lien, special assessments for sewerage or streets, or ad valorem taxes which constitute or could constitute a lien against the Property or any part thereof:

SPECIAL EXCEPTIONS:

a.  First Mortgage Lien to Patricia Jackson and Tallullah River Company, Inc.

b.  County Ad Valorem Taxes

c.  Two River Cabins/Bobcat are liened **BUT** __NOT__ transferred.

d.  Judgment/Consent Order in Tallullah River Mtn. Resort, Inc. Versus Tallulah River Company, Inc. and Patricia Jackson.

3. That except as set forth in said Paragraph 2., above, there is no outstanding indebtedness for equipment, appliances or other fixtures owned by owner attached to or located in or on the Property.

4. That there are no disputes concerning the location of the lines and corners of the Property.

5. That except as set forth in said Paragraph 2., above, owner has no notice of, and there are not any, pending suits, assessments, proceedings, judgments, condemnations, bankruptcies, liens or executions against owner in either Rabun County or any other county of the State of Georgia which do or could adversely affect title to the Property and/or which could affect Owner's right, power or ability to convey the property to purchaser.

6. That no work, improvements or repairs have been undertaken by or at the instance of Owner (or any partners, agents of representatives of Owner) on the Property or any part thereof during the ninety-five (95) days immediately preceding the date of the making of this affidavit for which payment has not been made; and there are no outstanding bills for labor or materials used in making improvements or repairs upon the Property at the instance of Owner (or any partners, agents of representatives of Owner) or for the services of architects, surveyors or engineers incurred in connection therewith.

7. That except as set forth in said Paragraph 2., above, Owner is in exclusive possession of the Property and that no other parties have any claim to possession of the Property.

8. That this affidavit is made for the purpose of inducing, **North Georgia Mountain Investment Group, LLC,** to purchase and use the realty described above, and a title company to issue lender's/owner's title policies should same be desired by either lender or purchaser.

9. No labor, materials or services have been furnished to or for the improvement of the

Page 1 of 2

STATE OF GEORGIA
_____ COUNTY

I, THE UNDERSIGNED, Clerk of the Superior Court, Rabun County, Georgia, DO HEREBY CERTIFY that the within and foregoing is a true and correct copy of the original as it appears on record and file in the Office of the Clerk of Superior Court, Rabun County, Georgia

Witness my hand and the Seal of Said Court
This the 25ᵗʰ day of June , 20 14

_____
Clerk Superior Court Holly E. Holly-Perry
Rabun County, Georgia

Book O29 Page 497

subject Property by any third person or entity during the three-month period immediately preceding the date of this affidavit; or, if any labor, materials or services have been so furnished during said three-month period, the agreed price or reasonable value of said labor, materials or services has been paid in full or has been waived in writing by the person or entity so furnishing or providing same. This affidavit is given pursuant to 44-14-361.2, O.C.G.A., as part of a transaction involving a conveyance of title to the subject Property in a bona fide sale.

10. That owner has no knowledge of and has received no notice of pollutants, toxic or hazardous waste, waste, garbage, petroleum products or substances, asbestos or asbestos containing materials, or polychlorinated biphenyls being improperly or illegally discharged, dispersed, stored, treated, generated, disposed of, manufactured, produced, spilled, leaked pumped, poured, emptied., injected, escaped, or being installed, used incorporated into, disposed of, released at, located on or located in the aforementioned real property while the property has been owned, operated, or in any manner controlled by the Owner or any of its affiliates or at any other time. In addition, owner has no knowledge of and has received no notice of any underground storage, transfer or dispersion tanks, lines or systems being located on or in the property or having been located on or in the property while the property has been owned, operated, or in any manner controlled by the Owner or any of their affiliates or at any other time.

This affidavit is made with full knowledge that the representation made herein will be relied upon by **the closing attorneys as well as North Georgia Mountain Investment Group, LLC,** in its purchase and use of the above-described property. Further, this affidavit is made with full knowledge that said affidavit shall expressly survive the closing and that the representations contained herein shall expressly survive the closing.

Pursuant to O.C.G.A. Section 48-7-1(10), this transaction is not subject to withholding because the owner(s)/seller(s) is/are individual residents of the State of Georgia, residing at: _505 Jonathan Pl , Clarkesville, Ga 30523_
_____ _ms_ Initial(s)

Signed, sealed and delivered
in the presence of:

Date: ____2.7.06____

Sworn to and subscribed before
me this _7th_ day of _Feb___ 2006.

_Christina N._
Notary Public

Signed, sealed and delivered
in the presence of:

Date: ____2. 7. 06____

Sworn to and subscribed before
me this _7th_ day of _Feb__ 2006.

_Christina N._
Notary Public

_____ (Seal)
**Tallullah River Mountain Resort, Inc.**

_____ (Seal)
**Myron Smith**

# EXHIBIT "G"

# TO DEFENDANTS' VERIFIED FIRST AMENDED

# COUNTERCLAIM

# AND FIRST THIRD-PARTY CLAIM

# SANDERS, RANCK & SKILLING, P.C.

ATTORNEYS AT LAW
P.O. BOX 1005
TOCCOA, GEORGIA   30577
LAW OFFICES

*JANNEY E. SANDERS*
*BRIAN C. RANCK*
*MATTHEW D. SKILLING*

*597 BIG A ROAD*
*706-886-7533*
*FAX: 706-886-0617*
*REAL ESTATE FAX: 706-282-0766*
*E-MAIL: jsanders@toccoalaw.com*
*www.toccoalaw.com*

April 30, 2014

**CERTIFIED MAIL NO. 7012 1010 0001 1207 1149**
**RETURN RECEIPT REQUESTED**
Tallulah River Mountain Resort, Inc.
Highway 441 North
Tallulah Falls, GA 30573

**CERTIFIED MAIL NO. 7012 1010 0001 1207 1156**
**RETURN RECEIPT REQUESTED**
North Georgia Mountain Investment Group, LLC
P. O. Box 1072
Watkinsville, GA 30677

Dear Sir/Madam:

This office represents Tallulah River Co., Inc., a/k/a Tallulah River Company, ("Tallulah River Co., Inc.") which has placed with our office for collection a promissory note given by Tallulah River Mountain Resort, Inc. to Tallulah River Co., Inc. dated April 4, 1999 in the principal amount of $2,513,067.05. We are advised that this note is now in default for non-payment. Pursuant to the terms of the note, the Tallulah River Co., Inc. hereby demands payment in full of the amount due under the note, including the principal, accrued interest, and late penalty fees. The total due, as of March 4, 2014, is $1,614,945.05.

PLEASE BE ADVISED THAT, NOTWITHSTANDING ANY PREVIOUS PRACTICE BY TALLULAH RIVER CO., INC. TO ACCEPT LATE PAYMENTS, TALLULAH RIVER CO., INC. NOW INSISTS ON STRICT COMPLIANCE AND NO FURTHER LATE PAYMENTS WILL BE ACCEPTED.

Unless, within 30 days of your receipt of this notice, you dispute the validity of this debt or any portion thereof, the debt will be assumed to be valid and in the amount claimed. If you do dispute the validity or the amount of this debt, you must notify this office in writing within 30 days that the debt, or any portion thereof, is disputed. In such event, this office will obtain verification of the debt, or its amount; or the original creditor,

April 30, 2014
Page 2

if different from the current creditor; or a copy of any judgment against you in connection with this debt; and said verification will be mailed to you. Should you request such information in writing within 30 days, this office will provide you with the name and address of the original creditor, if different from current creditor. This communication is sent to you in an attempt to collect this debt. Any information obtained will be used for that purpose.

The note which you signed provides that if it is placed in the hands of an attorney for collection, you shall be liable for attorney's fees of 15% of the balance owed. Notice is hereby given to you that the provisions relative to the payment of attorney's fees, in addition to the principal and interest, shall be enforced.

Georgia law provides that you shall have ten (10) days from the date of your receipt of this notice to pay the principal and interest in the total amount of $1,614,945.05 plus accrued interest through the date of payment, without being liable for the additional attorney's fees. If you pay the principal and interest before the expiration of ten (10) days from the date of your receipt of this notice, you will be under no obligation to pay the attorney's fees. However, if you fail to pay the full amount within said time, suit will be instituted against you for the full amount plus 15% of the balance due as attorney's fees.

Pat Jackson with Tallulah River Co., Inc. is the individual who has full authority to negotiate, amend, and modify all terms of the note and security deed with you on behalf of Tallulah River Co., Inc. Pat Jackson's mailing address is P. O. 1886, Clarkesville, Georgia 30523 and phone number is (706) 499-6999.

This will inform you that in the event you fail to pay the full amount as set out above, Tallulah River Co., Inc. fully intends to pursue such remedies as necessary to satisfy the note, including foreclosure of the security deed to Tallulah River Co., Inc., dated April 4, 1999 in the original amount of $2,513,067.05 said deed is recorded in Deed Book U-18, Pages 494-496, Rabun County Georgia Deed Records, as modified by that certain Modification Agreement dated November 1, 2001 and recorded in Deed Book U-21, Pages 282-284, on December 14, 2001, recorded in Rabun County Deed Records.

In connection with the foreclosure of the security deed, Tallulah River Co., Inc. intends to cause a notice to begin running in the <u>Clayton Tribune</u> on May 8, 2014, and continuing on May 15, 22, and May 29, 2014 to permit Tallulah River Co., Inc. to sell the

April 30, 2014
Page 3

property at public sale at the courthouse door on the first Tuesday in June, the same being June 3, 2014.

In this connection, and pursuant to <u>O.C.G.A.</u> Section 44-14-162.2, I am enclosing a copy of the Notice of Sale which will be submitted to the <u>Clayton Tribune</u> to be run for four weeks prior to June 3, 2014.

If you have any questions about your loan or the security for the loan, please do not hesitate to call me.

PLEASE BE GOVERNED ACCORDINGLY.

Sincerely yours,

JES/pw                                          JANNEY E. SANDERS
Enclosure
cc:    Tallulah River Co., Inc.

THIS LAW FIRM IS ACTING AS A DEBT COLLECTOR
ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE

IN THE SUPERIOR COURT OF RABUN COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| **TALLULAH RIVER CO., INC. A/K/A** | ) | |
| **TALLULAH RIVER COMPANY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs** | ) | |
| | ) | |
| **NORTH GEORGIA MOUNTAIN** | ) | **CIVIL ACTION** |
| **INVESTMENT GROUP, LLC and** | ) | **FILE NO. 2014-CV-0150-C** |
| **TALLULAH RIVER MOUNTAIN** | ) | |
| **RESORT, INC. AND OTHER** | ) | |
| **TENANTS IN POSSESSION,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **vs** | ) | |
| | ) | |
| **PATRICIA JACKSON and RANDY** | ) | |
| **JACKSON,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served a copy of the foregoing **DEFENDANTS'**

**VERIFIED FIRST AMENDED COUNTERCLAIM AND FIRST THIRD-PARTY CLAIM**

on opposing counsel by depositing the same in the U.S. Mail with adequate postage affixed thereto

and by statutory electronic delivery via PeachCourt.

Matthew D. Skilling, Esq.
Sanders, Ranck & Skilling, P.C.
P.O. Box 1005
Toccoa, GA 30577

-29-

This 31st day of May, 2016.

HUESTIS LAW, LLC

ROBERT S. HUESTIS
Georgia Bar No. 374740

480 E. Broad Street
The Franklin House
Suites 116 & 102
Athens, Georgia 30601
(706) 549-7770
Rob@businesslawga.com

-30-