# EXHIBIT D

IN THE SUPERIOR COURT OF RABUN COUNTY

STATE OF GEORGIA

```
ROBERT A. THOMSEN              :
                               :
v.                             :    CASE NO:  2014-CV-0150
                               :
TALLULAH RIVER COMPANY, INC.   :
a/k/a TALLULAH RIVER COMPANY,  :
PATRICIA JACKSON, AND          :
RANDY JACKSON                  :
..............................
```

JURY TRIAL - VOLUME I of VI

August 19, 2019
Rabun County Courthouse

BEFORE:   HONORABLE JACKSON HARRIS
          Senior Superior Court Judge, Mountain Circuit
          Post Office Box 485
          Clarkesville, Georgia  30523

APPEARANCES:

On behalf of the Plaintiff:
Mr. Robert S. Huestis
Huestis Law, LLC
480 East Broad Street, Suite 102
Athens, Georgia  30601

On behalf of the Defendant:
Mr. Matthew D. Skilling
Sanders, Ranck & Skilling, PC
Post Office Box 1005
Toccoa, Georgia  30577

Reported by:
Lisa P.S. Short
Certified Court Reporter
135 Glover Road
Cleveland, Georgia  30528
706-969-8906

INDEX TO PROCEEDINGS

JURORS SWORN                                                    10

OPENING STATEMENT BY MR. HEUSTIS                                26

OPENING STATEMENT BY MR. SKILLING                               41

TESTIMONY

    **ROBERT THOMSEN**

        Direct Examination by Mr. Huestis ...............  58

VOLUME II                                                      137

TESTIMONY

    **ROBERT THOMSEN**

        Continued Direct Examination by Mr. Huestis ..... 149
        Cross-Examination by Mr. Skilling ............... 214

    **STEPHANIE MALONEY**

        Direct Examination by Mr. Huestis ............... 292
        Cross-Examination by Mr. Skilling ............... 298
        Redirect Examination by Mr. Huestis ............. 301

    **BRUCE PENN**

        Direct Examination by Mr. Huestis ............... 303
        Cross-Examination by Mr. Skilling ............... 328

    **PATRICIA JACKSON**

        Cross-Examination by Mr. Huestis ................ 336

VOLUME III                                                     396

TESTIMONY

    **PATRICIA JACKSON**

        Continued Cross-Examination by Mr. Huestis ...... 398

INDEX TO PROCEEDINGS CONTINUED

TESTIMONY

    **RANDY JACKSON**

        Cross-Examination by Mr. Huestis ................ 473

    **ROBERT HUESTIS**

        Statement in place by Mr. Huestis ............... 506
        Cross-Examination by Mr. Skilling ............... 512

MOTION FOR DIRECTED VERDICT BREACH OF WARRANTY      515

COURT'S RULING ON THE MOTION      528

MOTION FOR DIRECTED VERDICT BREACH OF CONTRACT      529

COURT'S RULING ON THE MOTION      532

MOTION FOR DIRECTED VERDICT BREACH OF COTENANCY      534

COURT'S RULING ON THE MOTION      538

TESTIMONY

    **WILLIAM MARTIN TALLEY**

        Direct Examination by Mr. Skilling .............. 551

    **SAMUEL LORD RUMSEY**

        Direct Examination by Mr. Skilling .............. 565
        Cross-Examination by Mr. Huestis ................ 597

    **DOUG BOUDREAU**

        Direct Examination Deposition Excerpts .......... 608

VOLUME IV      632

TESTIMONY

    **PATRICIA JACKSON**

        Direct Examination by Mr. Skilling .............. 636
        Cross-Examination by Mr. Huestis ................ 657

```
1  _____
2                          STEPHANIE MALONEY
3           was called and, upon being first duly sworn,
4              was examined and testified as follows
5                         DIRECT EXAMINATION
6  BY MR. HUESTIS:
7       Q.   Ms. Maloney, I'm going to ask you some questions
8  today about your involvement in the resort.  These folks have
9  been hearing a good bit about it, so they certainly know
10 what's going on at this point.  But if you could start off by
11 introducing yourself to the jury.
12      A.   My name is Stephanie Maloney.  I live in Woodstock,
13 Georgia.
14      Q.   Are you married?
15      A.   I am.
16      Q.   Who's your husband?
17      A.   The gentleman sitting right there.
18      Q.   Okay.
19      A.   Edward Maloney.  I'm sorry.
20      Q.   Not at all.  Do you have some familiarity with the
21 resort, the property on 441 in Lakemont, the campground?
22      A.   Absolutely.  We've been -- we bought into it in 1989.
23 Our deed was filed in 1990.
24      Q.   I'm going to hand you just two packets of documents
25 -- or one single document, which is Plaintiff's Exhibit 27,
```

1   and then a composite exhibit, Plaintiff's Exhibit 28.  If you
2   can just take a second to peruse those.
3        A.   This looks like our documents.
4        Q.   Plaintiff's Exhibit --
5        A.   That was our address at the time.
6        Q.   You've looked at 27.  I'll take it back from you.
7        A.   Okay.  These are our signatures on the second page of
8   Number 28.  This is our copy of our contract.
9        Q.   Great.  Keep Plaintiff's Exhibit 28 in front of you.
10  Plaintiff's 27 is a warranty deed with a date of October 7,
11  1989.  Is that about when you first bought into the resort?
12       A.   Yes, it is.
13       Q.   Tell us about that.  How did you find out about it?
14  What made you decide to make a purchase like this?
15       A.   Got an advertisement, I think in the mail, and it
16  looked beautiful.  We made the drive up and toured the
17  property and met with Mr. Jackson, who sold us the deed, the
18  membership and the deed.  And it was beautiful.  It was river
19  property.  We -- the agreement was that we could camp there
20  anytime we wanted for the rest of our lives, and we could will
21  it to our children.
22       Q.   What did you pay for your deed?  Can you tell by
23  reference to Plaintiff's Exhibit 28?  And I am talking about
24  just the initial purchase price.
25       A.   It was -- I believe it was $5,000 total.

1      Q.  And did you then have to make additional payments
2  after that time?
3      A.  Yes.  You had to pay dues every year.
4      Q.  All right.  And did you pay, in addition to dues,
5  other --
6      A.  Special assessments.
7      Q.  Okay.  And were there other dues as well?
8      A.  There were -- every year.  You paid your dues every
9  year.  And I think all total with special assessments, we've
10 got about $10,000 for the -- over the years with the dues and
11 special assessments.  Yeah.
12     Q.  All right.  And so, you have a $5,000 purchase and
13 approximately $10,000 in payments over the years?
14     A.  That's correct.
15     Q.  Okay.  Just making sure I understand.  Did you
16 continue to camp there continuously from 1989 until 2014?
17     A.  Every year.  Every year, several times a year during
18 the summer with our teenage son.
19     Q.  All right.  Did you always go to the same spot?
20     A.  Pretty much.  We knew that we had to reserve it 45
21 days in advance.  So I would call.  I would have it on the
22 calendar.  I would reserve it in advance.  We also had family
23 reunions there, camping, you know, in tents and in the RVs.
24     Q.  Sure.  August 2014 timeframe, can you remember the
25 last time you had been out there?

1    A.  June or July.  It was within weeks before it was
2  foreclosed.
3    Q.  Can you describe for the jury the general condition
4  of the property at that time?
5    A.  It was a campground.  You know, I didn't expect
6  marble bathrooms or -- it was -- it's very comparable to any
7  campground that you would go to where people of all shapes and
8  sizes are using the restroom day and night.  And I loved the
9  camp -- I loved the campground.  I loved the campsites.  I
10 loved the way it was set up.  I have an RV.  I didn't have to
11 use the bathroom facilities unless I wanted to, but all of our
12 kids and tent campers did, and there was no problem.
13   Q.  Sounded like the bathroom facilities may have
14 suffered some.  Were there other aspects of the resort that,
15 perhaps, weren't up to par?
16   A.  I never encountered a problem.  I did -- I know that
17 one of the dump stations became unusable.  I never found out
18 why, only that we could no longer use it.  But there was
19 another one, so I didn't really care.  The shower curtains in
20 the ladies' restroom kind of got torn up a little bit and just
21 wear -- normal wear and tear, but nothing that I felt --
22 nothing that stopped you from using the facilities.
23   Q.  What about the outdoor pool?  Was that in use when
24 you last went out there in June of 2014?
25   A.  I never used it.  I honestly can't -- I know it was

1   in use for years and years while we were there, but, frankly,
2   I didn't even notice when we drove by because you drive by it
3   to get down to the campsite, and I didn't even notice it if it
4   was being used.  I'm sorry.
5        Q.  No problem.  In that year, 2014 or so, did you see
6   maintenance folks out there?
7        A.  All the time.  Used to talk to them.  They would come
8   and sit around the campfire with us.
9        Q.  All right.  How did you first hear about the
10  foreclosure?
11       A.  I called to make a reservation, and the -- that's not
12  true.  I had told Doug Boudreau, who was in the office, when
13  we left in June or July that I would be back in August.  And
14  he called me to let me know that they had closed the
15  campground, and that it was -- you know, it had been
16  foreclosed on, and it was closed, and that everybody had been
17  asked to leave.  And so, we drove up, and I saw the sign that
18  said closed due to foreclosure, call this number for
19  information.  And that's when I spoke with Pat Jackson.  I
20  called that number.
21       Q.  Tell us about that conversation with Pat Jackson.
22       A.  She basically said that, yeah, we have foreclosed
23  because mortgage payments weren't being made, and we
24  foreclosed on the property.  I asked her about all of us who
25  had actual deeds and owned the property, and she said, oh, let

1  me send you the paperwork to quitclaim that back to me.  And I
2  asked her if she was going to compensate me in any way for
3  that, and she said, perhaps you would like to help pay on some
4  of the maintenance or the taxes that haven't been paid.  And I
5  told her I wasn't contractually bound to do that, but it was
6  supposed to come out of my dues, and that was pretty much the
7  end of the phone call.  I thanked her for her time, and it was
8  -- that was it.
9        Q.  Did you want to go back out there and camp?
10       A.  Absolutely.
11       Q.  If you had to put a value on it, what would you say
12  was the value of your interest in the resort?
13       A.  I don't -- monetarily, that's hard for me.  I know
14  our son spent his summers there, growing up on that river.  We
15  now take our -- two of our grandchildren there, his children.
16  It's more of an emotional tie than it is -- I wouldn't sell it
17  for less than $20,000.  But, emotionally, I can't put a price
18  on it.  It's absolutely beautiful.  It's beautiful property.
19  It was beautiful when we bought it.  We would sit there at
20  night and talk about how lucky we were that we had this little
21  piece of dirt and how much we loved it.  And it just --
22       Q.  So if --
23       A.  It's broken our hearts.
24       Q.  So if you put $20,000 on one hand, and if you put
25  getting access to being a member again on the other, which one

1  would you pick?
2      A.  Being a member again.  We just love it there.  And my
3  son, I want to will it to -- it's been willed to my son and
4  his children.  You know, it's -- if the Jacksons were to honor
5  our contract today, I would be in heaven.  I'd be back, and
6  I'd be using facilities.
7          MR. HUESTIS:  Move to admit Plaintiff's Exhibit 27
8      and 28.
9          MR. SKILLING:  No objection.
10          THE COURT:  All right.
11
12      (Whereupon, Plaintiff's Exhibit Numbers 27 and 28
13              were admitted into evidence.)
14
15          MR. HUESTIS:  I don't have any other questions for
16      you.  Mr. Skilling may have some.
17                      CROSS-EXAMINATION
18  BY MR. SKILLING:
19      Q.  Mrs. Maloney, my name is Matt Skilling.
20      A.  How do you do?
21      Q.  Good.  I don't think we've ever met before.  Nice to
22  meet you.  I just have a few questions for you.  Over time
23  from '99 up and until 2008, did you notice a change in the
24  resort?
25      A.  A little bit, yeah.  There was a few maintenance

1   issues.  Things had started to be a little rundown.  But,
2   again, nothing that stopped you from enjoying it.
3        Q.  And is it fair to say that you were aware of the
4   complaints about the operation of the resort during -- from,
5   say, 2004 to 2014?
6        A.  That's a hard question to answer.  Rumors were
7   rampant.  There was -- you'd talk to one person, and it's, oh,
8   they're bankrupt, they're bankrupt.  And then the next person
9   would say, no, there's plenty of money in the bank; don't
10  worry about anything.  So I kind of didn't want to listen to
11  any of it until I was talking with someone who knew what they
12  were talking about.
13       Q.  Sure.  Now, during the time that you first began
14  coming to the resort, there was a reciprocal agreement that
15  existed; is that right?
16       A.  What do you mean?
17       Q.  Like with Coast to Coast.  Are you familiar with
18  that?
19       A.  Oh, yes.  We were members of Coast to Coast.
20       Q.  Right.  And that, eventually, after 2004, went away;
21  is that correct?
22       A.  Yes.  Well, we didn't -- you had to keep upping your
23  membership, and we didn't.
24       Q.  All right.  And, also, it was no longer -- the resort
25  was no longer part of that reciprocal membership?

1    A.  Well, because I didn't continue my membership with
2 Coast to Coast, I didn't care.  I was a member of that resort
3 and didn't worry about it.
4    Q.  Sure.  I understand.  Now, you indicated you were out
5 there in June and July --
6    A.  That's correct.
7    Q.  -- of 2014?
8    A.  Yes.
9    Q.  And fair to say no -- no one was -- you're not aware
10 of anyone using the indoor pool, correct?
11   A.  I don't think the indoor pool was in service at that
12 time.
13   Q.  Okay.
14   A.  No, no one was -- I think it was empty.
15   Q.  And, also, you're not aware of anybody being able to
16 use the putt-putt area, correct?
17   A.  That was the main maintenance issue was the little
18 golf course.  That was the only thing that I ever really
19 noticed had gone kind of to pot.
20   Q.  And is it your testimony that there was never a time
21 that there was problems with the flowing water at the property
22 where there was a puddle of water?
23   A.  We never -- no, we never had an issue.
24   Q.  Is that because you had an RV?  You didn't need it?
25   A.  Well, we still had to hook up to city water there.

1  We always stayed in the B section.
2       Q.  Okay.
3       A.  So we never had those issues.
4       Q.  And you're aware that, at some point in time, maybe
5  2012, the campground was open to the public?
6       A.  Yes.
7       Q.  All right.  And that was a change, correct?
8       A.  Yes, it was, but I thought it was a welcome one
9  because it meant revenue.
10          MR. SKILLING:  All right.  Thank you very much,
11      ma'am.
12                        REDIRECT EXAMINATION
13  BY MR. HUESTIS:
14      Q.  Did the problems with the putt-putt course prevent
15  the resort from being used as a membership campground?
16      A.  No, it was -- absolutely not, no.
17      Q.  Did you see anything else about the condition that
18  prevented it from being used as a membership campground when
19  you were last out there in 2014?
20      A.  No.
21          MR. HUESTIS:  Thank you.  No further questions.
22          THE COURT:  All right.  May the witness -- may the
23      witness be excused?
24          MR. SKILLING:  Yes, Your Honor.  No further
25      questions.

1              THE COURT:  Thank you.
2              MR. HUESTIS:  May they be permitted to stay in the
3     courtroom?
4              MR. SKILLING:  Unless they're going to be called for
5     rebuttal.
6              MR. HUESTIS:  We're not going to call them for
7     rebuttal.
8              THE COURT:  All right.  Call your next witness.
9              MR. HUESTIS:  We call Bruce Penn.  Your Honor, may
10    we approach, please?
11             THE COURT:  Yes.
12
13             (A conference was had at the bench
14                with the court reporter present.)
15
16             MR. SKILLING:  Can you give a proffer as to what
17    he's going to testify about?  Because in the past, we had
18    an issue with the time of the foreclosure, and I believe,
19    obviously, he's going to go forward from that.
20             MR. HUESTIS:  No, he's going to testify to the time
21    -- to the value at the time of the foreclosure, but he's
22    -- as Judge Caudell ruled.  He can take into account some
23    aspects of the revenue since the site leases.
24             MR. SKILLING:  I want to be sure.  We are going
25    beyond that.